IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TYLER JOHNSON, et al.,                    :
Individually and on behalf of
similarly situated employees              :

    v.                                    :   Civil Action No. DKC 18-3276

                                          :

HELION TECHNOLOGIES, INC.

                                          :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Fair Labor Standards Act case are a motion for summary judgment filed by Helion Technologies, Inc., and a cross-motion for summary judgment filed by one of the plaintiffs, William Toomey.  (ECF Nos. 89 and 92).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Helion's motion for summary judgment will be denied and Mr. Toomey's cross-motion for partial summary judgment will be granted.

## I.   Background

This case arises from the alleged failure of Defendant Helion Technologies, Inc. ("Helion") properly to pay its employees in various technical support roles ("technicians") for overtime work.  "Helion provides information technology ("IT") support for automobile dealerships . . . across the United States, providing for each [c]lient a reliable, efficient, and secure IT network and

all troubleshooting assistance necessary to diagnose and resolve problems that arise within that network." (ECF No. 21) (quoting the affidavit of Brandon Dorsey, Vice President of Operations at Helion, ECF No. 21-1, ¶ 2).[1]  Helion is a Maryland company with its principal place of business in Timonium, Maryland.  This case was initiated by former plaintiffs Tyler Johnson and James Phelan, in October 2018, as a potential collective and class action.  At present, the claims of four plaintiffs remain, along with the counterclaim by Helion against one of the plaintiffs.

Mr. Johnson, a resident of Baltimore County, Maryland, was employed by Helion from May 16, 2013 until around August 2018.  At the start of his employment, Mr. Johnson was a "Desktop Support Technician," also known as a "Desktop Support Engineer."[2]  Mr.

---

[1] Helion incorporates the background section contained in its opposition to the motion for conditional certification into its motion for summary judgment.  (ECF No. 89-1, at 4) (citing ECF No. 21, § III).

[2] As mentioned in a previous opinion, "The parties refer to the four positions [then at issue] differently.  Plaintiffs refer to the positions as Desktop Support Technicians/Engineers, Systems Support Technicians/Engineers, Outsource Field Department Technicians/Specialists, and Field Service Technicians/Engineers. (ECF No. 19-1, at 20 ¶ 106).  Defendant refers to the positions as Desktop Engineer, Systems Engineer, Outsource Field Specialist, and Field Engineer. (ECF No. 48, at 4 n.2)." (ECF No. 48, at 3); *Johnson v. Helion Techs., Inc.*, No. DKC 128-3276, 2019 WL 4447502, at *1 n.1 (D.Md. Sept. 17, 2019).  While the court adopted Plaintiffs' nomenclature and used "Technicians" instead of "Engineers," Plaintiffs confusingly seem to adopt Defendant's use of "Field Engineer[]" in their latest filing, (*see, e.g.*, ECF No. 92-1, at 40), and refer to one of the opt-in Plaintiffs as a "Systems Administrator" (*see, e.g.*, *id.*, at 24).  The affidavits

Dorsey's affidavit explains that "Desktop Engineers" "remotely diagnose and resolve IT problem, such as a printer problem or a problem with a single personal computer ("PC"), that affect only a single client user or a single peripheral device within the client's IT network, if that particular problem is susceptible to remote resolution." (ECF No. 21-1, ¶ 2(c)).

Around November 2015, Plaintiff Johnson was promoted to Outsource Field Technician.  In this role, his job was to oversee the retention and deployment of Helion's independent contractors. These contractors performed the same job as Field Engineers, who themselves did what the Desktop Support Technicians and Systems Administrators did, except on-site, instead of remotely.  (*Id.*). Problems outside the scope of a Desktop Support Technician were "escalate[d]" to Systems Administrators (*id.*), although Plaintiff disputes that such tasks were any more complex.

Plaintiff James Phelan worked as a Systems Administrator (although he termed it a "Systems Support Technician/Engineer") and his job description, even according to Helion, is virtually identical to that of a Desktop Support Technician.  (ECF No. 21-

---

submitted by Helion's "Systems Support Manager" in support of Defendant's motion (ECF No. 89-16) and reply (ECF No. 95-8) assert that a Systems Administrator is the same as a Systems Engineer but use the former as well.  Only two of these positions remain at issue and will be referred to as "Field Engineer" and "Systems Administrator," respectively, but the other two positions will be referred to as "Outsource Field Technician" and "Desktop Support Technician" in discussing the background of this case.

1, at 3).   Mr. Phelan was employed by Helion from November 28, 2011 to August 30, 2018.   He alleges that he worked over forty hours during given weeks in the relevant period and was not paid the proper amount.

It is not disputed that in February 2016, Helion reclassified the "Desktop-level positions," including the Desktop Support Technicians and Outsource Field Technicians, as non-exempt, and people in those positions began to receive proper overtime pay. But Plaintiffs argue that these groups never received backpay for the period in which they were (mis)categorized as exempt.

On October 23, 2018, the two Plaintiffs filed a claim on behalf of themselves and "other similarly situated Technicians," arguing that Defendant failed properly to pay them overtime wages—one and one-half times their normal wages—and seeking to recoup these wages "and other available relief."   The complaint was brought as part of a proposed collective under the Fair Labor Standards Act (FLSA), 29 U.S.C § 216(b), and as a class action pursuant to Fed.R.Civ.P. 23 under both the Maryland Wage and Hour Law, Md. Code, Lab. & Empl. §§ 3-401 *et seq.* ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code, Lab & Empl. §§ 3-501 *et seq.* ("MWPCL").   (ECF No. 1).   Two additional Plaintiffs later joined the suit as named parties: another Desktop Support Technician on October 24, 2018 (ECF No. 3); (*see* ECF No. 11-4), and a Field Engineer on November 8, 2018 (ECF No. 5); (*see*

4

ECF No. 11-6).  The latter Plaintiff, William Toomey, remains an active litigant.

On December 6, 2018, Defendant filed lawsuits against Mr. Johnson and Mr. Toomey in Maryland state court.  Both subsequently removed the cases to federal court.  Plaintiffs then sought leave to amend their complaint to include an allegation of retaliation under the FLSA (and leave to add the parties who had signed consent forms) (ECF No. 12) but withdrew this motion in the face of Defendant's opposition and filed a second amended complaint instead.  (ECF No. 19).  The two removed suits brought by Helion, however, were filed before different judges, one of whom granted a motion to consolidate that directed all future filings to made in the FLSA case.  The cases then were assigned to this member of the bench.  Helion opposed Mr. Johnson's removal (*see* ECF Nos. 25, 29, and 31), and the claim against him was severed and remanded to state court, thereby vacating the order to consolidate.  (ECF Nos. 32 and 33) (also granting ECF No. 19 to allow Plaintiffs' complaint to include an FLSA retaliation claim).  The removed lawsuit brought by Helion against Mr. Toomey, however, remained pending, even as Helion filed an amended answer and counterclaim against him in this FLSA suit.  The counterclaim against Mr. Toomey alleges breach of contract for personal frolics in his company vehicle and seeks damages for "wear and tear" to that vehicle and for what Helion contends are ill-begotten wages for those hours.  (ECF No. 41).

In December 2018, as the dispute over removal and consolidation was just beginning, the four Plaintiffs filed a motion for conditional certification as a collective and for court-authorized notice under the FLSA. (ECF No. 11). They argued that all four positions: Desktop Support Technicians, Systems Administrators, Outsource Field Technicians, and Field Engineers were "similarly situated" in that all provided "IT support to Defendant's clients," and their responsibilities "centered on manual labor and routine technical and service work. Their tasks were completed remotely or on-site at a client's location." In these roles, "Plaintiffs and other Technicians routinely worked over forty (40) hours each week." (ECF No. 11-1, at 2).

Ultimately, conditional certification was granted. Two plaintiffs settled their claims. Because the counterclaim against Mr. Toomey is identical to Helion's removed state claim against him, the latter was dismissed without prejudice. A "Joint Conditional Certification Notification Plan," including a proposed notice, was accepted on October 7, 2019. (ECF No. 54). Thirteen opt-in Plaintiffs subsequently joined the collective action. (*See* ECF Nos. 55-65, 68, and 73).

On July 24, 2020, Plaintiffs successfully moved to dismiss voluntarily eight of these opt-ins (ECF Nos. 76-77), which was granted by paperless order. A joint status report subsequently made clear that Mr. Phelan also wished to withdraw from the suit

6

voluntarily (ECF No. 81), and Plaintiffs filed an amended complaint that removed him as a named Plaintiff.  (ECF No. 88).  That left Mr. Toomey (Field Engineer) as the only remaining named Plaintiff, along with three opt-in Plaintiffs: Joseph McCloud (Field Engineer), Milton Turnerhill (Field Engineer), and Wayne Carroll (Systems Administrator).[3]

On January 15, 2021, Helion moved for summary judgment as to the claims by Toomey, McCloud, Turnerhill, and Carroll.  (ECF No. 89).  Plaintiffs filed an opposition as well as a cross-motion for summary judgment on Defendant's counterclaim against Mr. Toomey and on his own retaliation claim.  (ECF No. 92).  Defendant replied.  (ECF No. 95).

Prompted by assertions made in the motion papers, Helion filed a motion requesting additional discovery.  After a telephone conference, Helion was granted leave to file corrected exhibits, but not to conduct additional discovery prior to the resolution of the summary judgment motions.

## II.  Standard of Review

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute about a

---

[3] The status of two other opt-in plaintiffs, Jeremy Gold and Lauren Kegg, is unclear.

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the judge must ask [her]self not whether [s]he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252. When the parties file cross motions, each motion must be reviewed "separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citing *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998) and *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252. If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . which that party will bear the burden of proof at trial[,]" there can be no "genuine issue as to any material fact, since a complete failure of proof concerning

an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

### III. Motion for Summary Judgment

Helion moves for summary judgment because, "as a matter of law, (A) the FLSA overtime claims of the remaining Plaintiffs — McCloud, Toomey, Turnerhill, and Carroll — fail, (B) Plaintiff Toomey's FLSA retaliation claim fails, and (C) no Plaintiff has a viable claim under the [MWPCL]." (ECF No. 89-1, at 4).[4]  Helion is entitled to summary judgment on none of these grounds.

#### A.   Willful

Defendant first attempts to limit the applicable statute of limitations to two years, instead of the three for "willful" violations under the FLSA, thereby time-barring a number of Plaintiffs' allegations, and, it argues, effectively nullifying Mr. Turnerhill's claim in its entirety.[5]  It stresses that the

---

[4] Page number references reflect the number generated by the CM/ECF system, and not necessarily those on the document itself, except for references to depositions that will use the page numbers shown on the transcripts.

[5] Defendant points out that a two-year statute of limitations would limit Mr. Turnerhill's allegations to conduct occurring between December 3, 2017 and December 3, 2019, the day he opted into the case.  (ECF No. 89-1, at 13-14) (citing ECF No. 59). Helion asserts that Mr. Turnerhill, however, cannot raise any viable claim after his trip to Cancun in September 2017 because he agreed in his deposition that he was not making any claims in the period after this trip. (*Id.*) (citing ECF No. 89-8, at 176).

burden to show willfulness is on Plaintiffs and argues that they have failed to produce any evidence to support even an inference of it. (*Id.*, at 4-5) (quoting *Prusin v. Canton's Pearls, LLC*, No. 16-cv-00605-JKB, 2017 WL 4347867, at *2 (D.Md. Sept. 29, 2017)). It also asserts that Mr. Tannerhill stated in his deposition that it was "*not* his position that Helion ever intended to violate any laws relating to overtime," and that similarly Mr. McCloud stated "he does not know Helion's intention" during his deposition. (*Id.*, at 5) (ECF Nos. 89-7, at 55 and 89-8, at 103).[6]

Plaintiffs counter that willfulness is "not a subjective determination based on a particular plaintiff's personal beliefs and limited information on a company's state of mind" but fails to cite any caselaw in support. (ECF No. 92-1, at 17). Their opposition does, however, rely heavily on *Yassa v. EM Consulting Grp.*, No. 17-cv-00593-JKB, ECF No. 1 (D.Md. Mar. 1, 2017) (Complaint), another suit in which Helion was sued for FLSA violations, as proof that Defendant was on notice that its employment practices were illegal and presumptive proof of its

---

[6] Although Plaintiffs fail to argue the point in their opposition, these questions were both met with objection: the question to Mr. Turnerhill, Plaintiffs' counsel asserted, posed an inadmissible legal question to the witness, and counsel similarly raised an objection as to the form of the question posed to Mr. McCloud. Whether these statements are admissible is irrelevant at this juncture, however, as a material question as to willfulness exists regardless, as discussed more below; summary judgment on this issue therefore is improper.

"willfulness."   (ECF No. 92-1, at 17-18) (citing *Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999) (affirming the lower court's ruling that a violation was willful as, "There is undisputed evidence that Joshua had actual notice of the requirements of the Act.  He had been investigated for violations twice in the past, paid unpaid overtime wages, received explanations of what was required to comply with the Act, and assured the DOL that he would comply in the future.").

While the burden is on the employee to prove willfulness, *see Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 130 (4th Cir. 2015), "[t]he question of whether an employer acted willfully is generally a question of fact.".  Defendant's motion argues that each Plaintiff has "failed to supply any evidence that would support any inference of [willfulness]."  (ECF No. 89-1, at 5).  This is simply not true.  As Plaintiffs properly argue, the "prior lawsuit" is at least some evidence that the purported violation was done willfully in light of *Herman.*  (ECF No. 92-1, at 18).

Defendant attempts to distinguish *Herman* because it involved two previous Department of Labor ("DOL") overtime investigations, during which the defendants ensured the DOL of future compliance. This distinction, however, goes to the weight of Plaintiffs' notice argument and does not bar consideration of the suit in *Yassa*.  As even Defendant concedes, one of the positions at issue in that case was a Systems Engineer, as here.  This and other overlap

11

between the two cases is evidence that Helion was on notice of potential FLSA violations as to these related positions. (ECF No. 89-1, at 23) (detailing the effects of *Yassa* on the relevant employee classifications). Helion's choice to reclassify Field Engineers and not Systems Administrators after it was sued is also evidence of notice. (ECF No. 92-1, at 18) (highlighting this reclassification). Defendant cannot argue that *Yassa* has no bearing on how it treats Field Engineers (ECF No. 95, at 5), when it concedes that the "cost, disruption, and uncertainty" after the case prompted it to reevaluate and reclassify this exact position. (ECF No. 89-1, at 23). A material question remains as to whether Defendant's alleged FLSA violations are willful, and so summary judgment on this issue will be denied.

**B.  Evidence of Overtime Hours Worked**

**1.  Plaintiffs' Own Estimates**

As to the merits of Plaintiffs' claims, Defendant argues that the three Field Engineer Plaintiffs, Mr. McCloud, Mr. Toomey, and Mr. Turnerhill, are unable to prove they worked any overtime, and thus, the FLSA claims of all three should fail. As for Mr. Carroll's FLSA claims, Defendant argues they also fail because the Systems Administrator position is exempt from the FLSA requirements. Even if it is not, Helion argues, Mr. Carroll is also unable to prove overtime work. (ECF No. 89-1, at 5-21).

Defendant's argument that none of these four Plaintiffs have produced viable evidence of overtime hours worked will be treated first, as this question turns on a single issue: whether Plaintiffs' failure to review the AutoTask records produced by Defendant and purported reliance on their own "bald estimate[s]" means that they have not produced sufficient evidence to show that they worked more than forty hours in a given week during the periods in which they were treated as exempt by Helion.[7] Without a clear evidentiary source, Defendant argues, these estimates lack foundation.  It argues that reliance on them is "particularly striking" in light of various portions of Plaintiffs' depositions and answers to interrogatories in which each expressed a need to or committed to reviewing any records of hours worked produced by Helion.  (*Id.*).  Defendant also attempts to demonstrate inaccuracies in these estimates by arguing, for example, that each of Plaintiffs' "hours-worked estimate fails to consider paid time off and holidays."  (ECF No. 89-1, at 7, 11, 14, and 20).

Defendant argues that Jeffrey Kingsmore, Helion's "Systems Support Manager," and Lucas Johnson, Helion's Vice President of

---

[7] The complaint does not allege that any of the employees who were reclassified as non-exempt were not properly compensated for overtime work afterward.  Nevertheless, Defendant asserts that the payroll records (ECF No. 89-11) it attaches stamp out a suggestion by Mr. McCloud in his deposition that Helion continued to underpay him for overtime work, even after his reclassification.  (ECF No. 89-1, at 6-7) (citing ECF No. 89-7, at 33-35).

Human Resources, both explain in their respective depositions that "exempt employees[8] track time worked in AutoTask (a ticketing system)." (ECF No. 89-1, at 9 n.4) (citing ECF Nos. 89-19, at 34-35, 52-53, 110; and 89-20, at 46-48, 54-60). Tellingly, Defendant does *not* claim that the AutoTask records prove that these Plaintiffs never worked more than forty hours during the week. Rather, Helion individually claims each Plaintiff simply cannot prove his case. (ECF No. 89-1, 5-15, 19-21) (citing *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059-60 (8th Cir. 2014)).

As anticipated in Defendant's motion, Plaintiffs contend that the AutoTask records "do not paint the entire picture." Plaintiffs state that they *were not* instructed to record all their work hours in the program and it was not even a "time clock"; rather it was set up to keep track of the various projects Helion employees had and sometimes would automatically assign inaccurate times to

---

[8] Despite such a statement by Defendant, made in reference to the Field Engineer position, the depositions themselves, and Defendant's later discussion, suggest that Helion is asserting that AutoTask was used to track all the work hours on various projects by *all* employees, not just those they classify as exempt. Mr. Johnson, for example, explained that "AutoTask is our main system that keeps track of everything that we do, all of our clients, and all the work that the organization conducts every single day . . . . The tickets or issues that come in, those are referred to as tickets, so we track all the time that's conducted on those tickets." (*See* ECF No. 89-20, at 46). Alternatively, Mr. Kingsmore explained that while AutoTask was not used to "bill our clients based off of the time that the technicians work," such reporting was expected to be exact as it was the "tech's responsibility to accurately bill how much time they work on a ticket." (ECF No. 89-19, at 52-53).

various tasks.  (ECF No. 92-1, at 19).  Both Mr. McCloud and Mr. Turnerhill assert that they had communications with other Field Engineers that were not captured in AutoTask, for example. (ECF No. 92-1, at 19).

Plaintiffs argue that in the face of purportedly incomplete AutoTask records, Plaintiffs, particularly Mr. McCloud and Mr. Turnerhill, simply can "rely on estimates" of the hours they worked to survive summary judgment.  (*Id.*, at 20-21, 23) (citing, among others, *Alston v. DIRECTV, Inc.*, 254 F.Supp.3d 765, 789 n.12 (D.S.C. 2017) (distinguishing *Holaway* and other "out-of-circuit authorities," because, insofar as they place the initial burden on plaintiffs in an FLSA case to produce "other substantiating evidence" beyond their own estimates, this "proposition cannot be squared with the practice of district courts in the Fourth Circuit, which permit sworn statements alone to satisfy the initial burden, a practice with which this court agrees"), and *Wirtz v. Durham Sandwich Co.*, 367 F.2d 810, 812 (4th Cir. 1966) (affirming the district court's factual findings on hours worked that was based solely on the "credited testimony" of an employee, as the defendant "failed to keep any records of the time" that the employee worked). In fact, Plaintiffs assert that not only has Mr. Toomey produced sworn testimony in support of his claims for overtime hours worked, but also that even if the court was to treat the AutoTask records as "complete and accurate," "the records themselves indicate that

Plaintiff worked overtime." (ECF No. 92-1, at 21 n.6) (citing ECF No. 89-14).[9]

Plaintiffs' reliance on their own estimates in light of their claim that AutoTask is incomplete and inaccurate is not fatal. For example, Mr. McCloud asserts in his deposition that he worked, on average, "between 45 and 50 hours a week" that is "[f]ive, ten hours [of overtime] a week." (ECF No. 92-8, at 5); (ECF No. 89-7, at 77). He explains that this includes not just travel time to get to a client, but also sometimes "just being at the dealership . . . [f]ive or six extra hours just being there." (ECF No. 89-7, at 79). Mr. Turnerhill, on the other hand, testified that he worked 50 to 55 hours a week before going to Cancun and "40, 45, maybe 50" after as "things calmed down." (ECF No. 92-1, at 23) (citing ECF No. 92-4, at 110-11).

Defendant asserts that "as of his November 13, 2020 deposition, [Mr. McCloud] had done no documentary or other analysis to reach [his] estimate," as if that fact is dispositive. (ECF No. 89-1, at 7) (citing ECF No. 87-7, at 68). Nonetheless, within

---

[9] It is left entirely unclear by Helion as to how the data from AutoTask was extracted to form this spreadsheet. Nonetheless, it contains a column for the Helion client associated with any given entry, the date of that entry, and the "Resource" that shows the employee completing that task, and the hours worked. Numerous weeks, for example the week of 11/9/2015 (ECF No. 89-14, at 1), total to over forty hours, some substantially. (*See, e.g.*, ECF No. 89-14, at 15, showing a total of 64.02 hours worked for the week of 7/10/2016). Nonetheless, Plaintiffs do not object to the admissibility of this exhibit.

the "Damages-Claimed Sheet" submitted by Plaintiffs, Plaintiffs assert that Mr. McCloud worked an average of 7.5 hours of overtime over the course of his alleged 100 weeks worked, for which he was not compensated.   Presumably operating off the pre-Cancun time period, this sheet also asserts that Mr. Turnerhill worked 52.5 hours per week (12.5 hours of overtime).   (ECF No. 89-9).[10]

Some of the caselaw relied on by Plaintiffs involves the necessary proof of an FLSA plaintiff where an employer has failed entirely to produce records of hours worked.   *See Wirtz*, 367 F.2d at 812 ("[the defendant] failed to keep *any* records of the time [its employee] worked.") (emphasis added); *Hurd v. NDL, Inc.*, No. 11-cv-1944-CCB, 2012 WL 642425, at *4 (D.Md. Feb. 27, 2012)[11] (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) *superseded by statute on other grounds*, Portal-to-Portal Act, Portal-to-Portal Act of 1947, Pub.L. No. 80-49 § 4(a), 61

---

[10] Alternatively, Mr. Toomey's evidence goes beyond his own testimony as he argues that even AutoTask shows he worked overtime. But Mr. Carroll and Mr. Toomey arrive at their respective estimates by adding estimated hours for being "on-call" and for hours worked on the road under the "continuous workday" doctrine, which will be discussed more below.   (ECF No. 92-1, at 21-22, 24).   As the Damages-Claimed Sheet shows, Mr. Toomey reports 59 hours of work per week (19 hours of overtime) and Mr. Carroll reports 55 hours a week (15 hours of overtime).   (ECF No. 89-9); (*see also* ECF No. 92-1, at 24) (explaining how Mr. Carroll arrived at this estimate).

[11] Plaintiffs provide the proper case number, date, and Westlaw citation of this relevant case but mislabel it with another case name.   (ECF No. 92-1, at 20).   The case, *Etienne v. Ameri Benz Auto Service LLC*, appears at 14-cv-2800-PWG, 2016 WL 1222569 (D.Md. Mar. 29, 2016).

Stat. 86–87 (codified at 29 U.S.C. 254(a)). *Mt. Clemens*, itself, however, provided a burden shifting mechanism to ensure that an employer could not capitalize on incomplete or inaccurate records either, by allowing a plaintiff to put forth his own evidence in the face of simply inaccurate or incomplete records:

> When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. *But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises.* The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Mt. Clemens*, 328 U.S. at 687-88; *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) (discussing the standard set out by *Mt. Clemens* and the policy behind it).

As a result, courts have applied this framework and found that sworn statements could carry a plaintiff's initial burden under this relaxed standard.  For example, in *Alston*, the defendants acknowledged the *Mt. Clemens* framework — unlike here where Defendant does not acknowledge the case at all (*see generally* ECF No. 95) — but argued that the plaintiffs had failed to meet their initial burden.  The court rejected this and noted:

> With respect to the sufficiency of Plaintiffs' testimony, the court begins by noting that, generally, in this court, an FLSA plaintiff's estimations offered in sworn statements as to the amount of improperly compensated work is, alone, sufficient to meet his initial burden under the *Mt. Clemens* framework, even if the estimation is imprecise.

*Alston*, 254 F.Supp.3d, at 788 (relying on, among others, *Wirtz*, 367 F.2d at 812).  The court found that the sworn testimony had to be credited in creating a material issue of fact, *even where there was* "*inconsistency or even contradiction*" in those sworn statements. *Id.*, at 789-90 (emphasis added).  Judge Gallagher has cited favorably to *Alston* and other analogous cases and confirmed that even inaccurate or contradictory testimony by a plaintiff can defeat a motion for summary judgment in the face of arguably inaccurate employer records. *Yin Wen Chen v. Royal Garden Adult*

*Med. Daycare Ctr., Inc.*, No. 17-cv-2087-SAG, 2018 WL 6394157, at
*4-5 (D.Md. Dec. 6, 2018) (collecting cases and quoting *Alston*,
254 F.Supp. 3d, at 789-90("At the summary judgment stage [] the
court is not permitted to decide credibility, and, thus, the court
concludes that Plaintiffs' sworn statements, inconsistent or
contradictory though they may be, are sufficient to raise a genuine
dispute as to whether Plaintiffs have met their initial burden.")).
Importantly, Judge Gallagher treated the mere dispute over the
accuracy of the employer records as triggering the *Mt. Clemens*
framework, in viewing the facts most favorable to plaintiff as the
nonmoving party on this issue.  *Id.*, at *4.  In a more recent case,
she stressed that, under the federal statute as well as the
Maryland code, the employer has an obligation to "make, keep, and
preserve" records of the hours worked.  *Ramirez v. 316 Charles,
LLC.*, No. 19-cv-03252-SAG, 2020 WL 7398807, at *7 (D.Md. Dec. 17,
2020) (citing 29 U.S.C. § 211(c); 29 C.F.R. § 516.2; and Md. Code
Ann. Lab. & Empl. § 3-424).

Many courts similarly have treated inaccurate or incomplete
employer records of hours worked as akin to missing records at
this stage of litigation in the sense that this failure similarly
lowers the burden of proof on the plaintiff.  Very recently, the
Eastern District of New York explained:

> "[A]t summary judgment, if an employer's
> records are inaccurate or inadequate, an
> employee need only present sufficient evidence

> to show the amount and extent of the
> uncompensated work as a matter of just and
> reasonable inference." *Kuebel* [*v. Black &
> Decker, Inc.*], 643 F.3d [352,] 362 [(2d Cir.
> 2011); *see also Pierre v. Hajar, Inc.*, No. 15-
> cv-2772, 2018 WL 2393158, at *3 (E.D.N.Y. Mar.
> 28, 2018) ("When an employer does not meet
> these recordkeeping requirements, or
> otherwise fails to preserve accurate or
> adequate records, the employee's burden of
> proof lessens to sufficient evidence to show
> the amount and extent of the uncompensated
> work as a matter of just and reasonable
> inference.")  "An employee's burden in this
> regard is not high. [] It is possible for a
> plaintiff to meet this burden through
> estimates based on his own recollection."
> *Hernandez Gomez* [*v. 4 Runners, Inc.*], 769 F.
> App'x [1,] 2 [(2d Cir. 2019)]; *accord Kuebel*,
> 643 F.3d at 362; *see also Vecchio v. Quest
> Diagnostics Inc.*, No. 16 Civ. 5165, 2020 WL
> 5604080, at *7 (S.D.N.Y. Sept. 18, 2020)[.]

*Alvarado v. GC Dealer Servs. Inc.*, 511 F.Supp.3d 321, 365 (E.D.N.Y. 2021).

Defendant expressly argues that Plaintiffs had a legal duty to review and to refute or accept the records that Helion produced before relying on their own estimates. (ECF No. 89-1, at 8-9). This argument misstates the law. The quoted caselaw makes clear that when a plaintiff introduces evidence of the defendant's inaccurate or incomplete recordkeeping, the plaintiff *may* rely on his or her own estimates. The burden then shifts to the defendant to produce records capable of negating those estimates and/or providing a precise and comprehensive accounting of the relevant hours worked. Nowhere does Helion state or explain how the

21

AutoTask records refute these estimates.  Nor does Helion rebut Plaintiffs' allegation that AutoTask does not function as a comprehensive, or even accurate, log of hours worked by a given Plaintiff.

Defendant correctly anticipates that each Plaintiff "may attempt to escape summary judgment by arguing that, as a practical matter, he failed to record in AutoTask the number of hours he spent on work that he performed." (ECF No. 89-1, at 8, 12, 15, and 21).  Each of these Plaintiffs, however, it claims, admitted that "Helion policy required him to document within AutoTask all time worked for Helion Clients." (*Id.*).  Defendant argues that Plaintiffs "can't bootstrap a failure by him to comply with that policy into a license to rely on a bald estimate."

As a threshold matter, in *Kuebel*, the Second Circuit squarely rejected a highly similar argument, credited by the lower court, that the inaccuracies found in the timesheets were "self-created," thereby requiring the plaintiff to prove "the amount of time he worked off-the-clock with specificity."  643 F.3d at 362-63 (quoting *Kuebel v. Black & Decker (U.S.) Inc.* ("*Kuebel II*"), No. 08-CV-6020T, 2010 WL 1930659, at *11 (May 12, 2010)).  As it stated, "an employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable." *Id.* at 363 (citing 29 U.S.C. § 211(c)).

More to the point, review of the portions of the depositions cited clearly *do not* show, at least viewed in the light most favorable to the nonmoving party, that Plaintiffs admitted they were expected accurately to report all hours worked in AutoTask. In fact, it tends to show that while AutoTask may have been accurate as to the type and scope of work done on a given day, it was not set up to, nor expected to, act as an accurate time-log of hours actually spent on that work.[12]   Moreover, while Mr. Johnson

---

[12] While Defendant asserts that Plaintiffs admitted to having knowledge of a Helion policy that required its employees to keep accurate time records in AutoTask, the portions of the depositions cited do not actually reflect this.   Taking each deposition in turn, Defendant does not even cite to a portion of Mr. McCloud's deposition on this point, but rather cites to the AutoTask Records themselves and the affidavit of Mr. Johnson that asserts that Helion maintains GPS records that purport to show where each Field Engineer traveled in his company car and for how long.   (ECF No. 89-1, at 8) (citing ECF Nos. 89-10, ¶ 7 and 89-12).   Neither of these establishes that Mr. McCloud made such an admission, and as will be discussed more below, the GPS data is not even admissible and thus cannot show what Defendant purports it to show. Alternatively, Mr. Toomey, it claims, purportedly made this admission at ECF No. 89-13 at 96, 172-73.   (ECF No. 89-10, at 12). Review of page 96 of ECF No. 89-13 shows the exact opposite, however: when Mr. Toomey was asked if his review of Defendant's AutoTask entries showed they contained "accurate times of the amount of time that you worked in a day?" He responded, "Not at all."   Moreover, pages 172 and 173 of his deposition, if they exist, are not attached to either Defendant's or Plaintiffs' motion.   (*See generally* ECF Nos. 89-13 and 92-3).   Pages 172 and 173 of Mr. Turnerhill's deposition are attached, however, and are also cited by Defendant on this point.   (ECF No. 89-1, at 15) (citing ECF No. 89-8, at 96, 172-73).   Review of page 96 of this deposition shows it is the *only* place an admission of this sort actually appears in any of the depositions: Mr. Turnerhill admits that he knew it was Helion policy "that all substantive work that you did for a client needed to be reflected/documented in AutoTask."   It does not follow that such a policy required the

asserts that "if anybody was to do anything, then they would account for their time on the task in a ticket in AutoTask," he admitted in his deposition that this program would not, for instance, record when an employee first arrived at the office during a "normal workday scheduled," as "[w]e don't use it as a time clock." (ECF No. 92-7, at 47).

Plaintiffs have submitted testimony that AutoTask was an incomplete or inaccurate record of hours worked by specific employees, and thus the burden shifts to Defendant to show they are, in fact, complete and dispositive on the question of whether Plaintiffs ever worked overtime.  Defendant, in turn, has failed to carry its burden of showing the accuracy of these records or their completeness.  For example, Helion fails entirely to explain how it would account for time in which the Field Engineers were speaking to each other, and not a client, on a project, or for time in which Plaintiffs had arrived at the office but were not yet working on a specific job.

Defendant purports to apply *Alston* and states that that the sworn statements about hours worked in that case still had to "rise

_____

hours reported to be accurate, however.  Pages 172-73 of this deposition show that Mr. Turnerhill was subsequently asked, "And with respect to your tickets, did you need to document within the Autotask system the work that you had done with respect to a ticket?"  He responded, yes, but a reasonable jury could find this is entirely consistent with Plaintiffs' argument that while the *work* done for clients was catalogued in AutoTask as discrete tasks, the actual time reflected for this work was far from accurate.

to the level of reasonable estimation." (ECF No. 95, at 10).
Here, it argues, Plaintiffs cannot claim their estimates are
reasonable "without reviewing Helion's records." (*Id.*, at 10-11).
But Defendant has not established that Plaintiffs are under any
duty to rely on its records in this way, particularly given the
evidence of their inaccuracy. Plaintiffs are entitled to rely on
their own estimates, and Defendant has not provided sufficient
evidence to negate the reasonableness of these estimates.

Even if *Holaway* (relied on heavily by Defendant) was binding
authority in this district, which it is not, Plaintiffs rightly
argue that the case is distinguishable on its facts: the evidence
of hours worked was deemed insufficient there as it was
"inconsistent and contradictory"; "[i]n contrast, Plaintiffs'
damage estimates are entirely consistent. Plaintiffs' position is
that the AutoTask records are incomplete, and that they worked
overtime in addition to the amount of time the AutoTask and GPS
records show." (ECF No. 92-1, at 20). A material question remains
as to whether the Plaintiffs worked overtime during the relevant
period, and summary judgment on this issue will be denied.

### 2.   The Compensability of Commute Time and On-call Time

Defendant also argues that the additional theories of
recovery put forth by Mr. Toomey and Mr. Carroll cannot establish
overtime worked, as a matter of law. It argues that Mr. Toomey is
not entitled to compensation for his hours commuting to and from

work, despite his assertion to the contrary, and that without counting this time, by his own concession, his hours worked in a given week would not exceed forty. (ECF No. 89-1, at 1). Helion also argues that while Mr. Carroll argues he should be compensated for hours "during which he was 'on call,'" this time is similarly noncompensable. (ECF No. 89-1, at 20) (citing *Skrzecz v. Gibson Island Corp.*, No. 13-cv-1796-RDB, 2014 WL 3400614, at *8-10 (D.Md. July 11, 2014) (explaining the factors analyzed to determine if time on-call is compensable)).

    **a.   Commute Time**

Mr. Toomey also argues that he was not compensated for his commute to work, even though he would spend it "talking with Helion customers." Additionally, he argues the was not compensated for time spent going from location to location "outside of normal work hours." (*Id.*, at 22) (citing 29 C.F.R. § 785.36 (stating, "There may be instances when travel from home to work is overtime" including, by way of example, where an employee is "called out at night" to travel to a jobsite)). As proof that this travel was substantial and after-hours, Mr. Toomey reports having had to stay at hotels when working in "other areas." (*Id.*) (citing ECF No. 89-13, at 46-47, 51-52).

As to this latter form of purportedly compensable commuting, Plaintiffs argue that "travel time to out-of-town jobsites" is invariably compensable under the FLSA and 29 C.F.R. § 785.39. (ECF

No. 92-1, at 22) (citing *Mendez v. Radec Corp.*, 232 F.R.D. 78, 86 (W.D.N.Y. 2005)); *see also Mendez*, 232 F.R.D. at 95 ("With respect to plaintiffs' claim for payment for travel time for travel to job sites where an overnight stay was expected, summary judgment is granted to plaintiffs on the issue of liability.  Class members who traveled to such job sites during their normal working hours, whether on work days or non-work days, were entitled to compensation for their travel time at the appropriate rate."). Defendant, however, does not attempt to distinguish this case and counters this particular argument only obliquely, without addressing overnight travel at all.

Defendant does argue that Mr. Toomey is wrong to assert "that the time he spent driving from his home on a particular day to the first work site (*i.e.*, Client dealership) he visited . . . and the time he spent driving from his last work site of the day back to his home is compensable."  (ECF No. 89-1, at 11).  Defendant argues that Mr. Toomey knew, in accepting his post as a Field Engineer, "that his territory would be Maryland, Virginia, and lower Pennsylvania" and thus, was on notice that he would have to commute varying distances to and from job sites.  "Under such circumstances, and as a matter of law," Helion argues that Mr. "Toomey's 'commute' time is not compensable."  (*Id.*, at 12) (quoting *Smith v. Aztec Well [Servicing Co.]*, 462 F.3d 1274, 128[6] n.3 (10th Cir. 2006)) ("[E]ven though the plaintiffs sometimes

spent up to seven hours commuting each day, their travel is still 'ordinary' and 'normal' home to work travel if it 'was a contemplated, normal occurrence under the employment contract.'") and *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 27[3] (2ᵈ Cir. 1999) ("Because [plaintiff's] extensive travel was a contemplated, normal occurrence under the employment contract entered into between [him] and [defendant], 28 C.F.R. § 785.35 forecloses [plaintiff's] entitlement to compensation under the FLSA.").

Plaintiffs counter that Mr. Toomey could not have contemplated such long commutes because "Plaintiff Toomey never signed an employment contract." (ECF No. 92-1, at 21). Further, in his deposition, he explained he "didn't sign up to work for Helion to have to drive four hours to work, you know, so I would hope that I would be compensated for it." (*Id.*, at 21-22) (citing 92-3, at 42). Plaintiffs rely on *Butler v. DirectSAT USA, LLC*, 55 F.Supp.3d 793, 814 (D.Md. 2014) and the "continuous workday" doctrine for the proposition that compensable hours begin when a person begins the first "principal activity of a job and ends with the employee's last principal activity." As that court explained,

> The Portal-to-Portal Act, 29 U.S.C. §§ 251–62, amended the FLSA and relieves employers of the obligation to compensate an employee for:
>
> > (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to
> or postliminary to [the] principal
> activity or activities. . . .

*Id.* at 806. Nonetheless, the court went on to explain that,

> Preliminary and postliminary activities are
> compensable [] if they are an "integral and
> indispensable part of the [employee's]
> principal activities." *Steiner v. Mitchell,*
> 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267
> (1956). The Fourth Circuit has adopted the
> Ninth Circuit's formulation of the term,
> holding that an act is "integral and
> indispensable" to the employer's principal
> activity when it is: "(1) necessary to the
> principal work performed; and (2) primarily
> benefit[s] the employer. An act is necessary
> to a principal activity if that act is
> required by law, by company policy, or by the
> nature of the work performed." *Perez* [*v.
> Mountaire Farms, Inc.,*] 650 F.3d [350,] 366
> [(2011)] (citing *Alvarez v. IBP, Inc.,* 339
> F.3d 894, 902-03 (9th Cir. 2003)).

*Id.* Plaintiffs simply argue, in conclusory fashion, that "[t]hose

calls were indispensable and integral to Plaintiff Toomey's

principal activities" and thus compensable. Neither side has

answered the pivotal question in this context though — whether the

work that Mr. Toomey did while commuting was "required by law, by

company policy, or by the nature of the work performed."

As to any commute time, whether overnight and to "out-of-

town" jobsites, or between or to more local ones, Defendant

assuredly has not carried its burden of proving that Plaintiffs

cannot recover for these alleged work hours as a matter of law.

Accordingly, summary judgment on this issue will be denied.

   b.   **On-Call Time**

   Plaintiffs contend that Defendant's argument and citation to *Skrzecz*, 2014 WL 3400614, at *8-10 (*see* ECF No. 89-1, at 20), is misplaced, as "Plaintiff Carroll is only seeking payment for the hours he performed work for the Defendant during his on-call weeks, not the time he spent sleeping or eating, for example." (ECF No. 92-1, at 23-24).   Defendant counters by arguing that Plaintiffs have changed their stance in this regard; Mr. Carroll's interrogatory, they point out, asserted he worked 105 hours during his on-call weeks (ECF No. 89-3, at 8, "INERROGATORY NO. 11"), and his deposition seemed to seek compensation for "all on-call hours." (ECF No. 89-17, at 77) ("I'm asking for some form of compensation to justify me sitting around waiting.").

   It is unclear what relevance this alleged shift in position has, except to suggest that Mr. Carroll has not been consistent in his theories of recovery.   It may be that Defendant implicitly is claiming this change amounts to an improper amendment of Mr. Carroll's allegations, and one that would prejudice Defendant as belated.   But Helion does not actually make this argument.   It does show that Plaintiffs implicitly concede that they cannot recover wages for Mr. Carroll's purported "on call" time in which he was not working, and for good reason.   Mr. Carroll explained in his deposition that being "on call" did not place physical restrictions on him except that he "needed to be within [an hour's]

range of a PC and Internet connection to comply with company standards as far as answering inbound calls." (ECF No. 89-1, at 19-20) (citing 89-17, at 67). As Defendant rightly argues in its motion, however, "that type of loose restriction does not render on-call time compensable." (*Id.*, at 20) (citing *Skrzecz*, 2014 WL 3400614, at *8-10 (finding that because the plaintiff could eat, sleep and watch television while being on-call, this time was not compensable, even though she could not leave the island on which she was stationed).

Nevertheless, responding to the refined request for compensation for only on-call hours during which Mr. Carroll actually worked, Helion's *only* rebuttal is to repeat the argument that Mr. Carroll cannot rely on his own estimates of his on-call time without first reviewing his AutoTask records. (ECF No. 95, at 18-19). As discussed, such testimony, despite Defendant's claim to the contrary, can be credited as proper evidence of hours worked given the allegations of AutoTask's inaccuracies and incompleteness. Beyond attempting categorically to bar the allegations in this way, Defendant provides no substantive reason why such overtime hours, purportedly worked during Mr. Carroll's additional "on-call" time, would not be compensable if his testimony is to be believed. Therefore, a material question on this issue remains and summary judgment will also be denied.

31

### 3.    Status of a Systems Administrator under the FLSA

Defendant additionally argues that Mr. Carroll's claims for overtime under the FLSA fail because the Systems Administrator position is exempt. (ECF 89-1, at 15-19). It points to the FLSA's "computer professional exemption" ("CPE") that applies

> only to computer employees whose primary duty consists of:
>
>> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
>>
>> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>>
>> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
>>
>> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

29 C.F.R. § 541.400; *see also* 29 U.S.C. § 213(a)(17).

Defendant points to *Friedman v. Nat'l Indem. Co.*, in which a Nebraska district court wrote that "courts have routinely found that analyzing computer systems, troubleshooting *complex* server issues, and configuring computer networks satisfies the 'computer employee' exemption." No. 8:16-CV-258, 2018 WL 1954218, at *4

32

(D.Neb. Apr. 13, 2018) (collecting various district cases nationally) (emphasis added). In turn, it argues, Mr. Kingsmore's affidavit demonstrates that a Systems Administrator's duties "are similar or analogous to those found exempt in *Friedman* and the cases cited therein" and thus should be treated as exempt from the overtime requirements of the FLSA. (ECF No. 89-1, at 16).

In particular, Defendant argues that a Systems Administrator is Helion's "last line of defense for a Client's IT Network." It asserts that Mr. Carroll's deposition shows that this form of technician/engineer handled problems that were "escalated from the Desktop level" because of their "complexity." (ECF No. 89-1, at 17) (citing ECF No. 89-17, at 81-83). It also argues that this deposition shows that "Systems [Administrators], rather than Desktop-level employees, address complex network matters, because they have more experience than the latter and their level of skill and experience enables them to solve more complex system problems." (*Id.*) (citing ECF No. 89-17, at 92-93, 129-30). Defendant acknowledges that Mr. Carroll has argued that the "systems analysis" used to describe his duties in this role was "just a glorified term for effective troubleshooting," but argues the two terms nonetheless cover the exact type of IT systems analysis that prove this position is exempt. (*Id.*, at 17-19).

Plaintiffs argue that Defendant has entirely mischaracterized Mr. Carroll's testimony and the duties he was expected to perform

in his job.   They argue the evidence put forth by Mr. Carroll directly contradicts the "self-serving" affidavit of Mr. Kingsmore.  (ECF No. 92-1, at 26 n.7) (referencing ECF No. 89-1 at 13) (itself arguing Mr. Kingsmore has explained a Systems Administrator's duties "in detail" and that "those duties both fall squarely within the language of the Exemption and are similar or analogous to those found exempt in *Friedman* and the cases cited therein").  Taking the duties laid out in the CPE in turn, Plaintiffs write in pertinent part:

> As a Systems Administrator, Plaintiff Carroll never performed any of the duties that fall within the computer exemption. *See* 29 C.F.R. § 541.400. *See also* 29 U.S.C. § 213 (a)(17).  Carroll testified that he was simply performing basic troubleshooting and repairs remotely from his desk at an office. [ECF No. 92-6], *Carroll Dep*. 111:17–112:17, 124:4–22. He never applied systems analysis techniques to determine system functional specifications. *Id*. 88:3–89:3, 111:10–112:17, 123:10– 124:13.  He was never responsible for the design or implementation of any networking systems. *Id*. 118:16–119:12, 239:18–240:6.  He did not design, develop, analyze, test or modify computer systems based on design specifications. *Id*. 146:20–147:12, 239:18–240:6.  He never designed, tested, created or modified computer programs. *Id*. 107:17–109:16.  None of his duties required high level skills. *Id*. 82:7–17, 91:22–92:21, 190:14–191:10, 205:12–206:9.

(ECF No. 92-1, at 24).  In support of their argument that Mr. Carroll's duties were not the type of sophisticated systems analysis envisioned in the CPE, Plaintiffs argue that the solutions

Mr. Carroll was given to address client issues were "pre-determined" and that the same "basic troubleshooting steps" used in working with a client "could be completed by Helion's lower-level technicians." (ECF No. 92-1, at 24-25) (citing ECF No. 92-6, at 115-17, 127-28, 215-19). They point out that Mr. Carroll "could not think of a *single instance* when he needed to be creative" during his deposition and reported that he was never required to perform any coding. (*Id.*, at 25).

When asked whether "tickets escalated" to Systems Administrators "were at all more complex," Mr. Carroll said no. (*Id.*, at 80-81). Moreover, an issue labeled by Helion as "complex" or a "high-level issue" was not necessarily so, according to Plaintiffs. For example, determining when a server was offline was deemed "complex" by Helion, even though "this simply consisted of having to check whether the power was on." (ECF No. 92-6, at 93, 97, 122-123, 125-128). Other examples of problems labeled "complex" included "[s]imply giving users access to files and resolving internet outages." What actually determined which issues were labeled "complex," Mr. Carroll implies, was whether the client was "high-profile" or not. (*Id.*, at 91, 190-91). The additional experience possessed by a Systems Administrator, Plaintiffs argue, simply afforded the position the ability to solve these problems more quickly, it does not show that these problems were "beyond the expertise of the desktop person." (*Id.*, at 82, 92).

As further evidence that these tasks were not complex in any technical sense, Plaintiffs point out that Helion, according to Mr. Carroll's deposition, had specialized departments to handle all "advanced systems and programming issues that clients had." (ECF No. 92-1, at 36) (citing ECF No. 92-6, at 82-83, 239-40) (explaining that a Systems Administrator "was the last tier of generalized expertise" and merely did "basic troubleshooting" to decide whether to send the problem on to one of these "specific other departments").

By comparison, Plaintiffs argue that *Friedman* and the line of cases it quotes are entirely inapposite.  The plaintiff in *Friedman*, for example, "was a network engineer with vast experience in electronic networks and infrastructures." (ECF No. 92-1, at 26-27) (citing *Friedman*, 2018 WL 1954218, at *1, *4).   In particular, he was hired specifically to engineer and build-out an entirely new "centralized data center."  (*Id.*)  In this role he had to design and configure the client's "entire networking infrastructure" and was required to identify "'super complex' server problems" and "'significant [and] persistent' systems issues." (*Id.*).  Plaintiffs assert "[t]hese duties are inapposite to Carroll's," as, far from controlling "entire computer systems," "[h]is duties were limited to responding to help desk tickets and troubleshooting individual computers."  (*Id.*).

Plaintiffs attempt similarly to distinguish the other cases relied on by Defendant on this point. (*See, e.g.*, ECF No. 92-1, at 28, 31) (distinguishing *Grills v. Hewlett-Packard Co.*, 88 F.Supp.3d 822, 823, 826-27 (N.D. Ohio 2015) where the plaintiff was an "advanced engineer" and seen as a "technical leader" with "five (5) advanced certifications."). Unlike Mr. Carroll, Plaintiffs argue, the plaintiff in that case "had 'to be creative'" and use "expert judgment." (*Id.*, at 28) (quoting *Grills*, 88 F.Supp.3d at 824, 827).[13]

Defendant counters that advanced degrees and education are irrelevant to whether an employee is exempt and that, in fact, the exemption can apply to even those roles that do not "require the exercise of independent judgment and discretion." (ECF No. 95, at

---

[13] While some of these factors seemingly exist outside the statutory language of the CPE, they have been folded into the *Friedman* analysis; in a footnote, Plaintiffs explain that the reasoning of *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 577 (6th Cir. 2004), although decided under a different "computer professional exemption" of § 213(a)(1) and not the "more recent" CPE, is relied on by *Friedman* and its progeny, which themselves take into account an employee's prior experience and level of education in determining if a position is exempt. (ECF No. 92-1, at 27 n. 8) (quoting *Friedman*, 2018 WL 1954218, at *3-5 (finding the plaintiff's job was "distinguishable from the duties and responsibilities, at issue in *Martin*. [] [The plaintiff] in *Martin* was not responsible for creating a computer system, or otherwise substantively involved in analytical decisions about how the network ought to function. [. . .] Instead, [the plaintiff's] job duties [in *Martin*] were limited to responding to help desk tickets, troubleshooting individual computers, installing simple software, and checking cables — tasks the [plaintiff], who had no computer certifications or advanced training, could easily manage.").

17) (quoting *Bobadilla v. MDRC*, No. 03 Civ. 9217, 2005 WL 2044938, at *6 n.5 (S.D.N.Y. Aug. 24, 2005)).  It suggests that Plaintiffs multiple page discussion of the Systems Administrator position is nothing more than a "vigorous – and very misleading – effort to 'dumb-down' [the] position" and is a "tortured characterization" of what Plaintiff actually testified to in his deposition.  (*Id.*, at 16).

In dealing with 29 U.S.C. §213(a)(1), the same exception at issue in *Martin*, this court has written:

> The FLSA was enacted by Congress as a remedial act and, therefore, its exemptions must be narrowly construed.  *See Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).  The burden of proving, with plain and unmistakable evidence, that an employee falls within an exempted category of the FLSA is on the employer.  *Id.; see also Wirtz v. Modern Trashmoval, Inc.*, 323 F.2d 451, 464 (4th Cir. 1963).  Under regulations promulgated by the Secretary of Labor, whether an employee qualifies for an administrative exemption under § 213 is determined according to one of two tests, depending on how much money the employee earns.  Both parties agree that the "short test" governs the determination of their status because each earned more than $250 per week.  Under the "short test," an employee is exempt from the Act's overtime provisions if (1) the employee's primary duty consists of "the performance of office or non-manual work directly related to management policies or general business operations of the employer," and (2) the employee's "performance of such primary duty includes work requiring the exercise of discretion and independent judgment."  29 C.F.R. § 541.214 (2003).

*Turney v. Human Genome Science, Inc.*, 292 F.Supp.2d 738, 744 (D.Md. 2003).   Many of these same considerations are the focus of contradictory evidence produced by the parties.   Accordingly, Helion, who bears the burden of proving the CPE applies, has not produced "plain and unmistakable" evidence that a Systems Administrator is exempt.   A material question of fact remains on whether Mr. Carroll's position was exempt under the FLSA, and summary judgment on this issue will be denied.

### 4.   Liquidated Damages

Defendant also moves to foreclose Plaintiffs' claims for liquidated damages.   It writes:

> In *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 132 (4th Cir. 2015), the Fourth Circuit recognized that a district court may refuse to award liquidated damages if the employer shows that any alleged FLSA overtime violation was in good faith and that it had reasonable grounds for believing that the act or omission at issue was not an FLSA violation.   Courts have rejected liquidated damages claims at the summary judgment stage when employers have made this showing at that juncture.   *Rindfleisch v. Gentiva Health Serv., Inc.*, 2015 WL 12551173, at *18-19 (N.D. Ga., Civil No. 1:10-CV-3288-SCJ, Oct. 28, 2015); *Muston v. MKI Sys., Inc.*, 951 F. Supp. 603, 613-14 (E.D.Va. 1997), *vacated on other grounds*, 121 F.3d 699 (4th Cir. 1997).   Helion can make that showing.[11]
> [FN11]   Importantly, absence of willfulness (relative to the statute-of-limitations issue) is evidence of the employer's good faith.   *See Perez* [] 650 F.3d [at] 375-76 [] ("[W]e credit the district court's finding that [the employer's] acts

were not 'willful' as evidence of [the employer's] good faith.").

(ECF No. 89-1, at 21 & n.11) (footnote number 10 omitted). Defendant points to the fact that Helion questioned and reanalyzed whether it was properly classifying its employees under the FLSA as somehow dispositive proof of good faith. (ECF No. 89-1, at 22). It argues in reply that Plaintiffs' purported failure directly to address this argument should entitle it to summary judgment on this point.[14] (ECF No. 95, at 20).

Plaintiffs argue in opposition that liquidated damages are expressly provided for in 29 U.S.C. § 216(b). Moreover, Plaintiffs argue, they are treated as "the norm for violations of" the FLSA. (ECF No. 92-1, at 39) (quoting *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997)). Plaintiffs add that, as Judge Nickerson wrote, "Liquidated damages are not seen as punitive, but as compensation for damages otherwise 'too obscure and difficult of proof.'" (*Rogers v. Sav. First Mortg., LLC*, 362 F.Supp.2d 624, 637 (D.Md. 2005) (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707-08 (1945)). Echoing Judge Nickerson, Judge Hazel more recently wrote, "The employer bears the 'plain and substantial burden of persuading

---

[14] In actuality, Plaintiffs directly address these "two analyses into the job classifications" in 2015 and 2018 that are highlighted by Defendant's motion. They argue that the failure of Defendant to approach Mr. Carroll about his ability to earn overtime as part of these assessments or to award Field Engineers "retroactive overtime payments," once reclassified, constitute "evidence of Defendant's bad faith." (ECF No. 92-1, at 40).

the court by proof that his failure to obey the statute was both in good faith and predicated upon reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict.'"! *Martinez Perez v. Cheng*, No. 18-cv-3348-GJH, 2019 WL 7049688, at *3 (D.Md. Dec. 23, 2019) (quoting *Rogers*, 362 F.Supp.2d at 638) (itself quoting *Wright v. Carrigg*, 275 F.2d 448, 449 (4th Cir. 1960)). !Plaintiffs correctly point out, "[t]his burden is a difficult one to meet. . . ."  (ECF No. 92-1, at 40) (quoting *Rogers*, 362 F.Supp.2d at 638).

The specific details of Defendant's previous attempts to reclassify the FLSA status of its employees, and any alleged signs of bad faith therein, need not be reached.  As Defendant's own footnote helps highlight, the question of willfulness as to the purported FLSA violation and good faith as to Helion's purported compliance with the statute are two sides of the same coin.  It would be nonsensical to rule Helion fails to prove its purported wage violations were not willful but has definitively proven its compliance was in good faith.  Plaintiffs have produced at least some evidence that Helion did not approach its obligations under the FLSA in good faith.  More importantly, Defendant has not carried its high burden of affirmatively showing good faith compliance with the FLSA.  Summary judgment on this issue will also be denied.

### 5.   Mr. Toomey's FLSA Retaliation Claim

Defendant seizes on the fact that Mr. Toomey purportedly identified his overtime pay allegation as the only source of damages in his answers to interrogatories.  It argues that this is fatal to his retaliation counterclaim.  (ECF No. 89-1, at 24).  As the fate of his retaliation claim is more robustly addressed in Mr. Toomey's cross motion for summary judgment and the responses to it, whether summary judgment is appropriate for either party on Mr. Toomey's retaliation claim will be discussed more fully below. Nonetheless, this attempt to bar Mr. Toomey's retaliation claim on highly technical grounds is a bit of a red herring; as Plaintiffs point out in the reply to their cross motion for summary judgment, "[c]ontrary to Helion's arguments, damages are not an element of retaliation."  (ECF No. 96, at 9) (citing *Munroe v. PartsBase, Inc.*, No. 08-80431, 2008 WL 4998777[, at *2] (S.D.Fla. Nov. 20, 2008) (listing the four elements of retaliation but with no mention of damages therein).  Defendant has failed to cite authority to establish damages are a necessary element of this claim, because, Plaintiffs assert, no such authority exists.  (*Id.*).

### 6.   The MWPCL Claims

Defendant argues that the three remaining opt-in Plaintiffs, Mr. McCloud, Mr. Turnerhill, and Mr. Carroll only became parties to the FLSA collective action when opting in and thus "have not asserted MWPCL claims."  (ECF No. 89-1, at 24).  Plaintiffs concede

this point and "do not oppose summary judgment on Plaintiff McCloud, Turnerhill or Carroll's MWPCL claims." (ECF No. 92-1, at 40-41) (note that neither side addresses how these claims relate to the claims under the MWHL, or whether the two are duplicitous in this context). Defendant also argues that Mr. Toomey's MWPCL claim fails – "for the same reasons that his FLSA overtime claim fails." (ECF No. 89-1, at 24). Plaintiffs, in turn, incorporate their arguments against summary judgment on the FSLA claims in opposition to this point. Therefore, having denied summary judgment on the FLSA claims, summary judgment on the MWPCL claims asserted by Mr. Toomey will also be denied, but granted as to any MWPCL claims by Plaintiffs McCloud, Turnerhill, or Carroll.

## IV.  Cross Motion for Summary Judgment

As part of their response to Defendant's motion for summary judgment, Plaintiffs filed their own cross motion for summary judgment. The cross motion argues two main points: (1) "Defendant's Breach of Contract Counterclaim Fails as a Matter of Law"; and (2) "Helion's Actions Constitute Illegal Retaliation Under the FLSA[.]" (ECF No. 92-1, at 16).

### A.  The Breach of Contract Claim against Mr. Toomey

On the first issue, Mr. Toomey argues that Helion cannot succeed on its breach of contract claim, as it has produced no actual contract in discovery and "no contract exists." Alternatively, Plaintiffs contend that Helion cannot argue that an

implied contract exists "because Maryland is an at-will employment state.  Therefore, the mere offer and acceptance of a job does not create an implied contract."  (ECF No. 92-1, at 10).

If a contract is found to exist, Plaintiffs argue in the alternative, that Defendant's apparent acquiescence to Mr. Toomey's purported "frolics" modified the contract to allow him to continue to engage in the same conduct.  Mr. Toomey testified to his awareness that his company car was tracked by GPS and that *any* deviation from approved travel was met with an immediate phone call from a supervisor.  (ECF No. 92-1, at 12).  Thus, even if there was a breach, Plaintiffs argue it was not material:

> If Helion believed Plaintiff Toomey to be engaging in personal frolics that were contrary to any supposed 'employment contract' to the extent that affected the purpose of the contract in an important or vital way, surely Helion would have admonished or terminated Plaintiff Toomey.  Helion's complete silence until after Toomey joined the lawsuit against Defendant proves that the 'contract' was not materially affected.

(ECF No. 92-1, at 13) (citing *CytImmune Scis., Inc. v. Paciotti*, [No. 16-cv-1010-PWG,] 2016 WL 3218726, at *3 (D.Md. June 10, 2016)) ("Maryland law provides that a breach is material if it affects the purpose of the contract in an important or vital way.") (internal quotation marks omitted).

Even assuming a contract exists and was not modified, Plaintiffs argue Defendant has not proven any breach.  They explain

44

that during his deposition, Mr. Toomey disavowed knowledge of any
of the locations he is claimed to have visited, and Defendant has
not proven affirmatively that he ever went to them.  (*Id.*, at 11).
Finally, even assuming material breach, Plaintiffs argue Defendant
has not submitted any evidence to support its claim for damages on
the purported "wear and tear" caused to its vehicle(s) by Mr.
Toomey's alleged frolics.  (*Id.*, at 13).[15]

Helion first counters by arguing that it does, in fact, have
evidence of Mr. Toomey's "frolics" and that this evidence shows
that he "caused Helion thousands of dollars in damages" in both
the "value of the time he spent and mileage."  (ECF No. 95, at
22).  In support, it cites to the affidavit of Mr. Johnson and two
new exhibits in which it places immense (and misplaced) stock:
Exhibits 4 and 5 – "Frolic Spreadsheet and Additional Frolic
Spreadsheet."  (*Id.*) (citing ECF No. 95-1, ¶¶ 17-21A and ECF Nos.
95-4 and 95-5).  Mr. Johnson's testimony, it argues, establishes
that Helion can identify the company car that Mr. Toomey drove
during his employment.  Review of the two exhibits, on the other
hand, reveals a simple excel spreadsheet listing times and dates,
addresses apparently coinciding to those time stamps, and a column
for "Time in Minutes."  This sheet, Helion asserts, is built

---

[15] Nonetheless, Plaintiffs concede in a footnote in their
reply to the cross motion that "Maryland does not recognize that
a breach of contract claim fails as a matter of law for failure to
prove damages."  (ECF No. 96, at 9 n.3).

directly from the GPS coordinates relayed by Mr. Toomey's company vehicle, and purportedly shows various non-work sites that this company car visited at various times, as well as the duration of these visits. It argues these entries definitively prove that Mr. Toomey was at these non-work sites during work hours. As alluded to, the corrected versions of these documents only added letter and number headers to the columns and rows of each sheet and neither correction substantively changed what each sheet purports to show.

Helion also counters the lack of an implied contract argument by asserting that "the acceptance of a job does in fact create a contract, since acceptance of a job constitutes employment." (ECF No. 95, at 24) (quoting *Edenbaum v. Schwarcz-Osztreicherne*, 165 Md.App. 233, 249-50 (2005)) ("Employment is a relationship created expressly or impliedly by an agreement calling for the employee to perform work under the control of the employer in return for some consideration by the employer."). As to Helion's alleged acquiescence to any frolics and modification of the contract, Helion argues that it could not have reacted contemporaneously to these purported frolics, as it did not discover them until after Mr. Toomey's termination. (*Id.*, at 25) (citing the affidavit of Mr. Johnson, ECF No. 95-1, at ¶¶ 22-23).

These thorny questions over contract formation and/or modification need not be answered. In their reply, Plaintiffs

46

sharpen their argument that Defendant has produced no evidence that Mr. Toomey breached the terms of his employment, even assuming the existence of a contract.  The only attempt at producing actual evidence is the recent production of Exhibits 4 and 5, but as Plaintiffs rightly protest in their reply,

> Helion's new exhibits were not produced in discovery and lack the necessary foundation to be admissible.  Helion has not provided any evidence that the documents used to support its exhibits were kept in the ordinary course of business, making it clear that they were only created for the purpose of opposing Mr. Toomey's summary judgment motion as to Helion's breach of contract claim.  There is no indication as to who created the exhibits and the information used to support them, how the locations were even discovered, who decided to name each location, the basis for these decisions, or the process that was even utilized to come up with the designations of "Personal Visits" and "Non-Helion Client Locations."

(ECF No. 96, at 6).

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, [and] set out facts that would be admissible in evidence[.]"  *See Shahin v. Xerox Corp.*, No. 14-cv-1716-DKC, 2015 WL 4459961, *1 (D.Md. July 20, 2015) (quoting Fed.R.Civ.P. 56(c)(4)).  The Fourth Circuit has explained that the court has some flexibility in what evidence it can consider on summary judgment:

> "The court and the parties have great flexibility with regard to the evidence that may be used on a [summary judgment]

47

> proceeding."  10A Charles Alan Wright, Arthur
> R. Miller & Mary Kay Kane, Federal Practice
> and Procedure § 2721 (3d ed.1998).  The court
> may consider materials that would themselves
> be admissible at trial, and the content or
> substance of otherwise inadmissible materials
> where the "the party submitting the evidence
> show[s] that it will be possible to put the
> information . . . into an admissible form."
> 11 James Wm. Moore et al., Moore's Federal
> Practice § 56.91[2] (3d ed.2015).  If the
> nonmovant objects to the court's consideration
> of "material cited to support or dispute a
> fact," Fed.R.Civ.P. 56(c)(2), the movant has
> the burden "to show that the material is
> admissible as presented or to explain the
> admissible form that is anticipated,"
> Fed.R.Civ.P. 56 advisory committee's note.

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790

F.3d 532, 538-39 (4th Cir. 2015).

While Defendant was granted leave to file its "corrected"

Exhibits 4 and 5 during a recent recorded telephone conference

with counsel, counsel for Defendant was unable to explain how the

proper foundation was laid for the admission of these exhibits as

evidence or why they were not simply excludable hearsay.  *See*

Fed.R.Civ.P. 801(c).  Plaintiffs presume that Defendant seeks to

enter these under the business records exception, Fed.R.Civ.P.

803(6), but Defendant has not explained, in its filings or during

the phone conference, how this document arose in the regular course

of its business.  This is likely because it did not.  As Plaintiffs

rightly argue, this document was clearly prepared by someone

employed by, or at the behest of, Helion, and it was done so in

48

clear anticipation of proving Helion's breach claim against Mr. Toomey.

Even if these documents were created in the regular course of business, Defendant has not even begun to lay a foundation as to how or why this is the case. Helion treats the GPS data itself, which presumably *was* recorded in the regular course of business and on every company car, as self-evident proof of frolic. But Defendant's counsel admitted that the entries are not the raw GPS coordinates themselves, which would show nothing but a latitude and longitude, but are cross-references of these coordinates against some form of map — although counsel could not indicate exactly which, whether GoogleEarth or otherwise — in order to locate the store or location that most closely corresponds to these coordinates. Moreover, this is not a list of all the locations purportedly visited by Mr. Toomey, by Defendant's own description, but an isolation of those considered out-of-bounds for him. As was pointed out to Defendant's counsel, this would require yet another layer of analysis by having an employee of Helion (with personal knowledge of where Helion clients are located) look at all the locations purportedly matched to the GPS data to see they were proximate to an existing client.

As Plaintiffs argue, neither Defendant nor its counsel has identified whether these discrete tasks were carried out by one or more Helion employees, who these employees are (*i.e.*, Mr. Johnson

and/or some other Helion employee), or how they arrived at the exact businesses listed in the spreadsheets. It also does not explain why several locations in Exhibit 4 were determined to be a "Personal Visit" (*see* ECF No. 95-4), or why a number of entries in Exhibit 5 do not list actual businesses, as elsewhere, but simply state "Non-Helion Client Location." (*See* ECF No. 95-5).

The failure to produce these documents or the witnesses to establish their evidentiary foundation in discovery is, alone, fatal to their consideration in summary judgment. *See* Fed.R.Civ.P. 26 (establishes an on-going duty to disclose). Regardless, Defendant has failed to carry its burden under Fed.R.Civ.P. 56 to show these materials are currently admissible or to explain "the admissible form that is anticipated." Having not produced evidence sufficient to establish a connection between the raw GPS data and an actual violation of the purported employment agreement between Helion and Mr. Toomey, Helion's breach of contract claim is doomed to fail. Plaintiffs' motion for summary judgment on this issue will be granted.

### B.   Retaliation under the FLSA

Plaintiffs argue that they have established all four elements "of a prima facie case of retaliation under the FSLA": "(1) engagement in protected activity; (2) [the defendant's awareness] of the plaintiff's protected activity; (3) an employment action disadvantaging the plaintiff; and (4) a causal connection between

the protected activity and the adverse action." (ECF No. 92-1, at 14) (quoting *Munroe v. PartsBase, Inc.*, No. 08-80431, 2008 WL 4998777[, at *2] (S.D.Fla. Nov. 20, 2008)). First, they argue "there is no question that Plaintiff Toomey engaged in protected activity by joining the lawsuit." Second, Defendant clearly had knowledge of Mr. Toomey's participation in the lawsuit; because, as they point out, it was notified of this "through the CM/ECF case management system." (ECF No. 92-1, at 14). Third, the standard for an adverse employment action in this context set out by the Fourth Circuit and borrowed from the Title VII retaliation standard – that the conduct "could well dissuade a reasonable worker from making or supporting a charge of discrimination" — is easily met by a lawsuit filed by an employer in immediate response to an FLSA case against it. (*Id.*) (quoting *Darveau v. Detecon, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008) (itself relying on *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Finally, Plaintiffs argue, the causal connection between the protected activity and retaliation can be assumed simply from the "close temporal proximity" between Mr. Toomey's participation in this lawsuit and claim filed against him (less than a month). (*Id.*, at 16) (citing, among others, *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) and *Torres v. Gristede's Operating Corp.*, 628 F.Supp.2d 447, 473-74 (S.D.N.Y. 2008)).

It does not matter, they assert, that Mr. Toomey was not a current employee at the time of the purported retaliation as "[a]ctions taken by an employer after an employee's termination – or an employee's voluntary departure – can qualify as 'adverse actions' under FLSA." (ECF No. 92-1, at 15) (quoting *Braxton v. Jackson*, No. 18-cv-1946-DKC, 2019 WL 4573381, at *4 (D.Md. Sept. 20, 2019)). Moreover, "[c]ourts have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions." *Munroe*, 2008 WL 4998777, at *2 (citing *Darveau*, 515 F.3d at 343 and *Torres*, 2008 WL 4054417, at *17); *see also Braxton*, 2019 WL 4573381, at *4 ("An employer's filing of a lawsuit 'with a retaliatory motive and without a reasonable basis in fact or law,' likewise may qualify as an 'adverse action' under FLSA.").

In response and in support of its own motion for summary judgment, Defendant reiterates its argument that Mr. Toomey failed to identify this claim as a source of damages in his interrogatory responses, and thus argues his retaliation claim is doomed. There is no caselaw to suggest that alleging specific damages are a necessary element of an FLSA claim. Dealing with a similar argument, the Eastern District of Pennsylvania recently wrote, "[The defendant] does not cite any caselaw suggesting that a plaintiff must allege the amount of damages with specificity in an FLSA retaliation action, and the [c]ourt's further research

reveals none." *Short-Irons v. Catham Acres Healthcare Grp.*, Inc., No. 18-5136, 2019 WL 3936356, at *3 (E.D.Penn. Aug. 20, 2019). The failure of Helion to point to *any* caselaw to support its contention that Mr. Toomey's claim is barred on this front is itself fatal to Defendant's motion for summary judgment on this ground. Moreover, Plaintiffs do seek "damages in excess of $75,000" on this claim, as per their amended complaint, including attorneys' fees and costs in mounting a defense to this claim. (ECF No. 19-2, ¶ 96).

In resisting Mr. Toomey's own claim for summary judgment on the retaliation claim, however, Helion points to caselaw that it says shows that summary judgment is equally inappropriate for Plaintiffs. Quoting Judge Xinis, Helion asserts, "Importantly, only lawsuits that are 'baseless in fact or law' may support a retaliation claim, for baseless suits are those which do not implicate the claimant's right to petition a court for its own redress of grievances." *Castillo v. Urquhart*, No. 17-cv-01810-PX, 2019 WL 4750294, at *7 (D.Md. Sept. 30, 2019) *rev'd on other grounds*, No. 19-2227, 2021 WL 1502418 (4th Cir. Apr. 16, 2021), (quoting *Darveau*, 515 F.3d, at 341). Judge Xinis emphasized that, critically, a retaliatory, adverse action under the FLSA is one that was committed "with a retaliatory motive *and* without a reasonable basis in fact or law." *Id.* Even though the court has found that Helion's claim against Mr. Toomey was ultimately lacking

in proof, it does not follow that it *necessarily* was without a "reasonable basis in fact and law." (*See* ECF No. 95, at 27).[16]

Defendant also asserts that its breach of contract arguments provide an express nonpretextual reason for filing the claim and that the burden then shifts for the plaintiff to prove "the real reason was retaliation." (ECF No. 95, at 27) (citing *New v. Fam. Health Care, P.C.*, No. 17-cv-02379-PX, 2019 WL 2744682, at *5 (D.Md. July 1, 2019)). Defendant highlights Judge Xinis' remark that, "temporal proximity alone does not rebut an employer's asserted non-retaliatory reason for the allegedly retaliatory action." (*Id.*) (citing *New*, 2019 WL 2744682, at *5).

This argument, however, entirely ignores the context in which *New* was decided. Earlier in the opinion, Judge Xinis stressed the ability of temporal proximity to give rise to an inference of retaliatory motive: "To be sure, close 'temporal proximity is sufficient to establish a prima facie causal connection between an employee's protected conduct and employer's adverse action.'" *New*, 2019 WL 2744682, at *4. The court noted that an exception existed where "the employer did not know of the protected activity," in which case "even temporal proximity cannot save a plaintiff's claim." *Id.* (quoting *Lee v. Safeway, Inc.*, No. 13-

---

[16] The *Castillo* court only said that a counterclaim that survived summary judgment was not baseless, not that one defeated in summary judgment *was* baseless. 2019 WL 4750294, at *8 (citing *Munroe*, 2009 WL 413721, at *9.

cv-3476-RBD, 2014 WL 4926183, at *11 (D.Md. Sept. 30, 2014)).  The court went on to note that, there, "[t]he record evidence demonstrates that none of the five physician-owners who terminated [the plaintiff] had any knowledge of her complaints."  *Id.*  Here, there is no doubt that Helion knew of Mr. Toomey's complaint.

To be sure, Judge Xinis did find an alternative (and independent) reason as to why summary judgment on the retaliation claim should be granted in favor of the defendants:

> [The plaintiff] has not marshalled any evidence that Defendants' articulated reason for her discharge is pretextual.  Defendants bear the burden "of production, not persuasion" in articulating legitimate grounds for [plaintiff's] firing.  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *see also Robinson v. Affinia Grp., Inc.*, 815 F. Supp. 2d 935, 943 (W.D.N.C. 2011) ("Defendant's burden is low such that it need not persuade the court that it was actually motivated by the proffered reasons so long as it otherwise articulates a legitimate reason that is supported by the evidence.") (internal marks and citation omitted).

*Id.*  The evidence on the record, in turn, did tend to show such a legitimate reason for termination in that case: "[t]he record demonstrates that [the plaintiff] was fired for abandoning her patient."  *Id.*, at *5

But here the record is entirely devoid of actual evidence of a breach of contract.  Defendant's failure to produce evidence in discovery, or even now, to show that Mr. Toomey engaged in "personal frolics" in his Helion vehicle, suggests that its claim

was without real basis.  Further, here, unlike in *New*, there is indisputable evidence that Helion knew of Mr. Toomey's participation as a named Plaintiff in this suit before filing a breach of contract claim against him in state court.

It is true that "baseless" in this context has been read by some courts to mean "totally baseless."  *See Torres*, 628 F.Supp. 2d at 474 (citing *Ergo v. Int'l Merch. Servs.,* 519 F.Supp.2d 765, 781 (N.D.Ill. 2007) and quoting *Orr v. James D. Julia, Inc.,* No. 07-51-B-W, 2008 WL 2605569, at *17 (D.Me. June 27, 2008) ("[D]efendants' filing of the counterclaim does not generate a genuine issue of retaliatory motive, especially where [the plaintiff] fails to demonstrate in his presentation that the counterclaims are baseless on factual or legal grounds.") (alteration in *Torres*)).

But here, this claim has proven to be *totally* baseless.  Even if Helion was, in fact, motivated simply by its belated discovery of Mr. Toomey's purported frolics, and only discovered these frolics upon examining its GPS records in light of "disturbing text messages between Toomey and one or more other persons," as Mr. Johnson reports in his affidavit (ECF No. 95-1, ¶ 22) (citing ECF No. 95-7), it cannot marshal *any* admissible evidence to show such frolics actually occurred.[17]  Helion's only argument that its

---

[17] Review of these "disturbing" text messages show text conversations, although it's far from clear as between whom, that

breach of contract claim was not prextexual and/or baseless is that it "has previously demonstrated herein that its breach of contract claim has a reasonable basis in fact and law." (ECF No. 95, at 27). But it ultimately did not do this as evidenced by the fact that this claim has not survived summary judgment. Defendant has not even met its burden of *production*, and so the burden does not shift back to Plaintiff to prove this reason is pretextual. *Cf. Torres*, 628 F.Supp.2d at 474-75 (Plaintiff "has articulated a legitimate, non-retaliatory reason for filing its counterclaims – namely, that it was bound to do so under the pleading requirements for compulsory counterclaims . . . . [T]he Court has already held that [the defendant's] counterclaims are permissive, not compulsory, and furthermore they lack any factual basis or evidentiary support.").[18]

---

seem to discuss the purchase of marijuana ("bud") as well as a sexual solicitation from a woman for money. (ECF No. 95-7, at 1-6). Even if these messages can be attributed to Mr. Toomey and retrieved from a Helion phone assigned to him, as Mr. Johnson asserts (ECF No. 95-1, ¶ 22), it is entirely unclear why this would prompt Helion to check the GPS records for Mr. Toomey's vehicle. It assuredly is not direct evidence that any personal frolics occurred on company time.

[18] While the Defendant in *Torres* was found to have failed even to "*state* a cause of action under New York's faithless servant doctrine," 628 F.Supp.2d at 473, the absolute barebones and unsubstantiated nature of its counterclaim against Mr. Toomey approaches, if not meets, this level of frivolousness. (ECF No. 41, at 18-20). Just as the defendant in *Torres* only "half-heartedly" supported its counterclaims, 628 F.Supp.2d at 474, the Defendant here had all of discovery to identify witnesses and evidence to support the contentions apparently made in Exhibits 4 and 5 and did not do so. Only now, at this late stage, has

Even if the burden did shift to Plaintiffs, they write that "the record makes clear that the counterclaim for breach of contract was baseless, and that Helion's filing of the counterclaim was retaliatory." (ECF No. 96, at 4). Indeed, it does; the close proximity between Mr. Toomey's addition to this case and Helion's suit against him, as well as Defendant's unquestionable knowledge of his involvement prior to this filing, prove a *prima facie* case of FLSA retaliation that Defendant utterly fails to rebut. Summary judgment in Mr. Toomey's favor on his retaliation claim is warranted.

## V.   Motion for Additional Discovery

Perhaps sensing the weakness in the proof offered on its breach of contract claim, Defendant now seeks additional discovery around what it purports is Mr. Toomey's "defense as to his alleged Kung Fu frolic." (ECF No. 99-1, at 2). But the burden is on Helion to prove that such a frolic occurred in the first instance, not on Plaintiffs to show otherwise in the face of a conclusory allegation. Having found the underlying claim to be without an evidentiary basis, Defendant will not be granted permission belatedly to seek out such a basis, well after discovery has closed.

---

Defendant made a far-reaching and highly belated request for additional discovery - to engage in a wild-goose chase to find individuals who may have seen Mr. Toomey at these locations at the stated times.

In the face of a motion for additional discovery filed after the close of discovery, this court has discussed the relevant standard:

> Fed.R.Civ.P. 16(b) governs the modification of a scheduling order. District courts have broad discretion to manage the timing of discovery. *Ardrey v. United Parcel Service,* 798 F.2d 679, 682 (4th Cir. 1986), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987). The only formal limitation on this discretion is that a party seeking modification must demonstrate good cause. Fed.R.Civ.P. 16(b)(4). "Good cause" is established when the moving party shows that she cannot meet the deadlines in the scheduling order despite diligent efforts. *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.,* 190 F.R.D. 372, 375 (D.Md. 1999) (quoting *Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co.,* 986 F.Supp. 959, 980 (D.S.C.1997), *aff'd by unpublished opinion,* 129 F.3d 116 (Table), 1997 WL 702267 (4th Cir. 1997)). Indeed, although other factors may be considered (*e.g.,* the length of the delay and whether the non-moving party could be prejudiced by the delay), *Tawwaab v. Va. Linen Serv., Inc.,*729 F.Supp.2d 757, 768–69 (D.Md. 2010), "the primary consideration . . . in [determin]ing whether 'good cause' has been shown under Rule 16(b) relates to the movant's diligence," *Reyazuddin v. Montgomery Cnty., Md.,* No. DKC 11-0951, 2012 WL 642838, at *3 (D.Md. Feb.27, 2012). Lack of diligence and carelessness are the "hallmarks of failure to meet the good cause standard." *W.Va. Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc.,* 200 F.R.D. 564, 567 (S.D.W.Va.2001). "If [the moving] party was not diligent, the inquiry should end." *Marcum v. Zimmer,* 163 F.R.D. 250, 254 (S.D.W.Va. 1995).

*Drasovean v. Eaton Corp.*, No. 11-cv-1288-DKC, 2012 WL 5409737, at *1 (D.Md. Nov. 5, 2012).

The moving party here, Helion, was assuredly not diligent in seeking out such evidence of frolic.  It cannot justify its own complacency by implying that it need only produce such evidence now, in the face of Mr. Toomey's defense that he has not visited the locations alleged by it.  The burden of proving the breach of contract counterclaim is on Helion, not Mr. Toomey, and Plaintiffs would be highly prejudiced by a reopening of the discovery period as to this claim, particularly as the evidence to date is entirely lacking.  The request for additional discovery will be denied.

## VI. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be denied, except as to any MWPCL claims asserted by Mr. McCloud, Mr, Turnerhill, or Mr. Carroll, Plaintiffs' cross-motion for partial summary judgement will be granted, and Defendant's request for additional discovery will be denied.  A separate order will follow.

                                    /s/
                            _____
                            DEBORAH K. CHASANOW
                            United States District Judge