IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TYLER JOHNSON, et al.,                    :
Individually and on behalf of
similarly situated employees              :

    v.                                  :   Civil Action No. DKC 18-3276

                                 :

HELION TECHNOLOGIES, INC.
                                 :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Fair Labor Standards Act ("FLSA") case is a motion filed by Defendant Helion Technologies, Inc. ("Helion") to alter or amend the judgment under Rule 59 and for judgment as a matter of law under Rule 50. (ECF No. 163). The issues have been fully briefed, and the court now rules, no hearing being necessary. Local Rule 105.6. For the following reasons, the motion will be denied.

**I.   Background**

This case primarily concerns unpaid overtime claims against Helion by four former employees, three Field Technicians and one Systems Administrator.[1] The Field Service Technician Plaintiffs, Joseph McCloud, William Toomey, and Milton Turnerhill, were employed to provide on-site information technology ("IT") system

_____

[1] The court previously used different names for these positions. It adopts "Field Service Technician" (or "Field Technician") and "Systems Administrator" here because those were the terms used on the verdict sheet at trial. (ECF No. 156).

support to Helion's automobile dealership clients.  Until May 2018, Helion classified the Field Technician Plaintiffs as exempt from overtime requirements under the Computer Employee Exemption.  On May 20, 2018, Helion reclassified them as non-exempt and began to pay them overtime wages.  Prior to their reclassification, Helion did not use a system to record the total hours that Field Technicians worked or the number of hours over forty that they worked in a given week.  As a Systems Administrator, Wayne Carroll provided remote IT-system support to Helion's clients.  Helion has always classified the Systems Administrator position as exempt from overtime requirements.

In October 2018, this collective FLSA action was initiated against Helion.  Various former Helion employees later opted-into the suit, but only Plaintiffs McCloud, Toomey, Turnerhill, and Carroll proceeded to trial.  Plaintiffs McCloud, Turnerhill, and Carroll's sole claims were for unpaid overtime under the FLSA.  Mr. Toomey brought claims for unpaid overtime under the FLSA and under the Maryland Wage and Hour Law ("MWHL") and the Maryland Wage Payment and Collection Law ("MWPCL").  Helion countersued Mr. Toomey for breach of contract and Mr. Toomey asserted, in response, a claim for FLSA retaliation.  The court granted summary judgment to Mr. Toomey on Helion's contract claim and on all liability as to his FLSA retaliation claim.  (ECF No. 107, ¶ 4).  It denied Helion's summary judgment motion on Plaintiffs' overtime claims.

2

A jury trial occurred from March 18 to March 28, 2022. Helion moved for judgment as a matter of law under Rule 50(a) at the close of Plaintiffs' case. The motion was largely denied. However, the court held that Mr. Toomey had not presented sufficient evidence of non-economic damages on his FLSA retaliation claim, declined to send that issue to the jury, and, because the amount of damages was the only remaining issue in that claim, awarded Mr. Toomey $1 in nominal damages. (ECF Nos. 149, at 1; 166, at 106-07). Helion again moved for judgment at the close of all evidence, incorporating the remaining grounds from its earlier motion. The court denied the motion and sent overtime claims to the jury.

The jury returned a verdict, (ECF No. 156), in favor of Helion on Mr. Carroll's FLSA claim, concluding that Helion proved that the Systems Administrator position was exempt under the Computer Employee Exemption. It separately found in favor of the three Field Technician Plaintiffs on their FLSA claims. The jury concluded that the Field Technician position was not exempt and that Helion failed to pay appropriate overtime, but that the violation was not willful. It awarded various damages amounts to each Field Technician Plaintiff for the two-year period before they joined the lawsuit. The jury also found in favor of Mr. Toomey on his parallel state-law claims. It awarded him the same amount for those violations as it did for the FLSA violation, even though the look back period was longer (three years) for the state

labor laws.  It found Mr. Toomey was not entitled to liquidated damages on his state-law claims because it found that he did not prove that Helion acted in bad faith.  The Field Technician Plaintiffs' liquidated damages under the FLSA were tried to the court. It declined to award any because it found that Helion acted in good faith.  (ECF No. 149, at 2-3).

On April 11, the prevailing Plaintiffs moved for attorneys' fees and costs.  (ECF No. 159).  The next day, Helion moved for attorneys' fees against Plaintiff Toomey.  (ECF No. 160).  Those motions have been stayed pending resolution of the post-trial substantive motion now at issue.  (ECF No. 162).  On April 26, Helion moved to alter or amend the judgment in favor of Plaintiff Toomey on his retaliation claim and renewed its motion for judgment as a matter of law on the Field Technician Plaintiffs' overtime claims.  (ECF No. 163).  Plaintiffs opposed and Helion replied. (ECF Nos. 164; 165).

## II.  Motion to Alter or Amend the Judgment on Plaintiff Toomey's FLSA Retaliation Claim

### A.  Standard of Review

Neither party provides the relevant standard of review.  A motion to alter or amend filed within 28 days of the judgment is governed by Federal Rule of Civil Procedure 59(e).  *See MLC Auto, LLC v. Town of S. Pines*, 532 F.3d 269, 280 (4th Cir. 2008); *Classen Immunotherapies, Inc. v. King Pharms., Inc.*, No. 04-cv-3621-WDQ,

2013 WL 5934055, at *3 (D.Md. Oct. 31, 2013).  "A district court has the discretion to grant a Rule 59(e) motion only in very narrow circumstances[.]"  *Hill v. Braxton*, 277 F.3d 701, 708 (4th Cir. 2002) (citation omitted).  Only one is relevant here: to correct clear error of law or prevent manifest injustice.  *See U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002) (citing *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)).  "In general, reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Pac. Ins. Co.*, 148 F.3d at 403 (internal quotation marks and citation omitted).

### B.  Analysis

Helion argues that the court's $1 nominal damages award on Mr. Toomey's FLSA retaliation claim was improper for three reasons. First, it contends that a violation of the FLSA's anti-retaliation provision is not "the type of invasion of common law or constitutional rights which typically triggers a nominal damages award."  (ECF No. 165, at 5 & n.4).  It is not clear whether Helion suggests nominal damages were not available at all or simply were not mandatory.  Second, Helion contends that Mr. Toomey "waived or forfeited any claim for nominal damages by failing to request a nominal-damages jury instruction and a verdict sheet line item for nominal damages."  (ECF No. 163-1, at 3).  Third, it argues that the nominal damages award was impermissible additur under the

Seventh Amendment.  (*Id.*).  Helion raised none of these objections at the time the court awarded Mr. Toomey nominal damages, after granting Helion's motion for judgment on Mr. Toomey's claim to non-economic damages.  (*See* ECF No. 166, at 107).

### 1.  Availability of Nominal Damages

To the extent that Helion argues otherwise, nominal damages are an available remedy for Mr. Toomey's FLSA retaliation claim. Under the statute, any employer who retaliates against its employee "shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of [the anti-retaliation provision], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount of liquidated damages."  29 U.S.C. § 216(b).

Nominal damages are a form of legal or equitable relief appropriate to effectuate the purposes of the FLSA's anti-retaliation provision.[2]  As the Supreme Court recently held, "nominal damages are in fact damages paid to the plaintiff" and constitute "'relief on the merits[.]'"  *Uzuegbunam v. Preczewski*,

_____

[2] Courts appear to disagree about whether nominal damages are legal or equitable in nature.  *Compare Griffith v. State of Colo., Div. of Youth Servs.*, 17 F.3d 1323, 1327 (10th Cir. 1994) (legal), *with Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 869-874 (9th Cir. 2017) (sometimes equitable).  The court need not resolve whether the nominal damages awarded to Mr. Toomey were legal or equitable to determine whether they are available in an FLSA retaliation action because the statute authorizes both.

141 S.Ct. 792, 801 (2021) (quoting *Farrar v. Hobby*, 506 U.S. 103, 11, 113 (1992)).  Courts have also held that nominal damages can be awarded to "vindicate rights" that might not cause tangible injury, *Bayer*, 861 F.3d at 872, because "*every* legal injury necessarily causes damage," *see Uzuegbunam*, 141 S.Ct. at 798-800 (emphasis in original) (summarizing cases); *see also Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir 2003) (nominal damages are "recognition of a violation of rights" (citation omitted)).  In addition, "[n]ominal damages serve . . . to clarify the identity of the prevailing party for the purposes of awarding attorney's fees and costs in appropriate cases."  *Bayer*, 861 F.3d at 872 (internal quotation marks and citation omitted).

In summary, nominal damages can compensate non-tangible injuries, vindicate rights, and signal who the prevailing party is, opening the door to attorney's fees.  These effects further the purposes of the FLSA's anti-retaliation provision by repairing damage, enabling employees to bring suit, and creating a deterrent against future violations.  In short, nominal damages "'affec[t] the behavior of the defendant towards the plaintiff' and thus independently provide redress."  *Uzuegbunam*, 141 S.Ct. at 801 (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)).  Moreover, the court has identified several cases in which plaintiffs were awarded nominal damages on FLSA retaliation claims.  *Sondesky v. Cherry Scaffolding Inc.*, Nos. 19-2899 & 19-2900, 2021 WL 4147099,

at *1 (3ᵈ Cir. Sept. 13, 2021) (unpublished); *Demirovic v. Ortega*, No. 15-cv-0327, 2018 WL 1935981, at *8 (E.D.N.Y. Apr. 24, 2018); *Schaeffer v. Warren Cnty.*, No. 14-cv-0945, 2017 WL 5709640, at *11 (S.D.Miss. Nov. 27, 2017).[3]

### 2. **Waiver**

First, the waiver rule is not implicated here.  The rule is invoked in cases where plaintiffs first seek nominal damages well after a verdict has been rendered or on appeal.  *See, e.g.*, *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 240 (1ˢᵗ Cir. 2006) (three months after verdict); *Berene*, 800 F.App'x at 760-61 (on appeal).  Here, nominal damages were raised and awarded during trial and before the jury was instructed.  It is nonsensical to suggest that Mr. Toomey waived his nominal damages claim in such circumstances.

Even if the waiver rule were relevant here, Mr. Toomey did not waive his request.  Even where an award of nominal damages is mandatory, it "can be waived."  *Berene*, 800 F.App'x at 761 n.5 (citing *Oliver v. Falla*, 258 F.3d 1277, 1281-82 (11ᵗʰ Cir. 2001) (collecting cases)); *Azimi*, 456 F.3d at 239-40 ("Regardless of

---

[3] The court need not resolve whether awarding Mr. Toomey nominal damages was mandatory under *Carey v. Piphus*, 435 U.S. 247 (1978).  At a minimum the award was available as a matter of discretion.  *See, e.g.*, *Berene v. Nationstar Mortgage, LLC*, 800 F.App'x 756, 761 n.5 (11ᵗʰ Cir. 2020) (citing *Carver Middle Sch. Gay-Straight Alliance v. Sch. Bd. of Lake Cnty.*, 842 F.3d 1324, 1331 (11ᵗʰ Cir. 2016)) (indicating that nominal damages may be discretionary where not mandatory).  Whether the award was mandatory or discretionary does not affect Helion's other challenges, as discussed further below.

whether an award of nominal damages is obligated in a . . . case where liability has been found, a request for nominal damages may be forfeited[.]").  To avoid waiver, a plaintiff must make a timely request for a nominal-damages jury instruction or from the court once a verdict has been reached.  *Azimi*, 456 F.3d at 240; *Oliver*, 258 F.3d at 1282.

Although not specifically stated in his complaint, Mr. Toomey made clear to the court at trial that he sought all available damages, including nominal damages.  His complaint asked for "legal or equitable relief appropriate to effectuate the purposes of" the FLSA's anti-retaliation provision.  (ECF No. 88-2, at 21).  While that alone would not be enough, *Azimi*, 456 F.3d at 240 n.10, Mr. Toomey also proposed a jury instruction stating, "This Court has already found that Defendant did retaliate against Plaintiff Toomey.  It is therefore left for you to determine what, if any, damages Plaintiff Toomey is entitled to."  (ECF No. 134, at 22).  He also proposed a verdict-sheet question asking, "What if any damages do you award Plaintiff William Toomey for his retaliation claim against Defendant?"  (ECF No. 123, at 3).  Helion objected to both proposals.  Although the parties focused their attention

on Mr. Toomey's request for non-economic damages, the scope of his proposed jury instruction and verdict-sheet question was broader.[4]

At the close of Plaintiffs' case, the court granted Helion's motion for judgment as a matter of law on Mr. Toomey's non-economic damages request because he had not introduced sufficient emotional-distress evidence.  In doing so, the court stated that Mr. Toomey "gets a dollar for this, and that means, I don't think I need to send it to the jury.  Is that right, [Plaintiffs' counsel]?" (ECF No. 166, at 107).  Mr. Toomey's attorney responded that he "would like [the court] to send it to the jury but I understand the Court's position." (*Id.*).  In other words, Mr. Toomey maintained that the non-economic damage request should go to the jury but, if it were not viable, he agreed that he was entitled to nominal damages.  (*Id.*).  Helion did not object. (*Id.*).

Under these circumstances, it would be wrong to conclude that Mr. Toomey waived his nominal damages claim.  At a minimum, his accession to a nominal damages award at the close of his case was enough to satisfy the timely request requirement.  That the court

---

[4] Helion argued pre-trial that Mr. Toomey could not seek non-economic damages on his retaliation claim because he had not made any request for them in his answer to Helion's interrogatories. Mr. Toomey delivered amended interrogatory answers to Helion before trial and Helion was permitted to examine Mr. Toomey regarding the testimony he intended to offer.  Satisfied that Helion would not be prejudiced, the court permitted Mr. Toomey to testify about his emotional distress.

first raised nominal damages in that moment is immaterial.   If anything, it reflects that Mr. Toomey had already put Helion and the court on notice to his intent to seek nominal damages. Helion's belated objection to this award is unpersuasive.

### 3.   Additur

The Seventh Amendment states that, "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."   The Supreme Court has held that, under the Seventh Amendment's reexamination clause, "[a] federal court may grant a new trial because of an inadequate verdict, but . . . it may not increase the damages above those awarded by the jury, either directly or by use of an additur."  Charles A. Miller & Arthur R. Wright, *Additur*, Federal Practice & Procedure § 2816 (3$^d$ ed. 2022); *see Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (citing *Dimick v. Schiedt*, 293 U.S. 474, 486-87 (1935)).

The court's decision to award Mr. Toomey one dollar in nominal damages did not violate the Seventh Amendment by impermissibly increasing a jury damages award to Mr. Toomey.   This is true whether the nominal damages award was mandatory or discretionary. If it was mandatory under *Carey v. Piphus*, it categorically could not be impermissible additur.  *Gibeau v. Nellis*, 18 F.3d 107, 111

11

(2d Cir. 1994); *Hicks v. Brown Grp., Inc.*, 902 F.2d 630, 652-54 (8th Cir. 1990), *vacated on other grounds*, 499 U.S. 914 (1991).  If the award was discretionary, it still did not violate the Seventh Amendment because the retaliation claim was not tried to the jury and there was no jury damages award on it.  Put another way, the nominal damage award was not the "bald addition of something which in no sense can be said to be included in the verdict" because there was no jury verdict on the retaliation claim.  *Dimick*, 293 U.S. at 486.

To the extent Helion argues that Mr. Toomey's nominal damages remedy must have been tried to the jury, it is mistaken.  "[T]he seventh amendment requires a jury trial upon demand where the amount in controversy exceeds twenty dollars." *Burt v. Abel*, 585 F.2d 613, 616 n.7 (4th Cir. 1978).  If a plaintiff's allegations "entitle him to no more than nominal damages, the seventh amendment will not be applicable because of an insufficient amount in controversy." *Id.*  In such a case, the district court may award nominal damages on the basis of its previous finding that a violation occurred.  *See id.*

Helion has not shown that awarding Mr. Toomey nominal damages on his FLSA retaliation claim was a clear error of law or created manifest injustice.  The award stands.

### III. Motion for Judgment Notwithstanding the Verdict on the Field Technician Overtime Claims

#### A.   Standard of Review

Federal Rule of Civil Procedure 50 governs the requirements for making both initial and renewed motions for judgment as a matter of law.  Rule 50(b) provides that a party may file a renewed motion for judgment, also known as judgment notwithstanding the verdict ("JNOV"), as a matter of law within twenty-eight days after the entry of judgment.  A court may grant JNOV if "there is no legally sufficient evidentiary basis for a reasonable jury to find in favor of that party on that issue."  Fed.R.Civ.P. 50(a).  In making this determination, "the judge is not to weigh the evidence or appraise the credibility of the witnesses, but must view the evidence in the light most favorable to the non-moving party and draw legitimate inferences in its favor." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) (citations omitted).

#### B.   Analysis

Helion makes two broad arguments which mirror arguments this court resolved at summary judgment.  First, it may argue that its analysis of GPS data from the Field Technician Plaintiffs' company vehicles satisfies its burden to maintain accurate time records under *Mt. Clemens*.  If so, it contends, the Field Technician Plaintiffs could not have relied on their own testimony to estimate their hours worked under the *Mt. Clemens* burden-shifting

13

framework.  Second, and in the alternative, Helion challenges the sufficiency of the Field Technician Plaintiffs' evidence of overtime hours worked.  It asserts that the Field Technician Plaintiffs' testimony could not support a just and reasonable inference of their hours worked for two reasons: (a) the testimony was too imprecise, and (b) the GPS data negated the reasonableness of the Field Technician Plaintiffs' estimates because it accurately captured all the work they performed, and they did not consider it when building their estimates.

Helion is wrong on all counts and is not entitled to judgment notwithstanding the verdict.  As an initial matter, the *Mt. Clemens* burden-shifting framework does not apply at trial (although it can inform what evidence is sufficient for a plaintiff to meet his burden of proof).  In any case, the GPS data did not satisfy Helion's duty to maintain accurate time records.  Furthermore, the Field Technician Plaintiffs' estimates were sufficiently detailed to support an inference of their hours worked and prove by a preponderance of the evidence that they were not paid for overtime work.  And the GPS data could not negate the Field Technician Plaintiffs' estimates as a matter of law, whether through its accuracy or their failure to consider it.

14

### 1.   Applicability of *Mt. Clemens* and Helion's Obligation to Maintain Accurate Time Records

The FLSA statute places on employers the duty "to keep proper records of wages, hours, and other conditions and practices of employment," because they are in the best position to do so. *Anderson v. Mt. Clemens*, 328 U.S. 680, 687 (1943), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, Pub.L. No. 80-49 § 4(a), 61 Stat. 86-87 (codified at 29 U.S.C. § 254(a)); *see also* 29 U.S.C. § 211(c) (codifying employer record-keeping duty). "[W]hen employers violate their statutory duty to keep proper records, [] employees thereby have no way to establish the time spent doing uncompensated work[.]" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) (citing *Mt. Clemens*, 328 U.S. at 687).

In *Anderson v. Mt. Clemens*, the Supreme Court held that, in such a situation, the "remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making the burden [of proof] an impossible hurdle for the employee." 328 U.S. 680 at 687.  A more forgiving standard of proof was necessary to avoid "penalize[ing] the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work[ and] . . . allow[ing] the employer to keep the benefits of an employee's labors without paying due compensation[.]" *Id.*

15

The Court adopted a burden-shifting framework that allows employees without access to accurate time records to rely on their own testimony to meet their burden of proof.

> [W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Mt. Clemens*, 328 U.S. at 687-88.

Helion misunderstands *Mt. Clemens*. As relevant here, it does two things. First, it imposes its burden-shifting framework at summary judgment, where it serves as an evidentiary tool to determine whether a genuine dispute of material fact exists regarding the number of hours an FLSA plaintiff worked. That burden-shifting framework has no purchase at trial and does not create a hurdle for plaintiffs to clear to present their own testimony to the jury. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993) (describing the *McDonnell Douglas* burden-shifting framework in Title VII employment discrimination cases as becoming "no longer relevant" once its initial hurdle has been

16

cleared and the defendant has introduced evidence to support its position).  At trial, the parties put their best evidence forward and the jury must decide whether the plaintiffs have proved their case.  The only relevant basis for a defendant in Helion's position to argue that a plaintiff's evidence should not reach the jury is the sufficiency of that evidence prove the plaintiff's case by a preponderance of the evidence.

That said, *Mt. Clemens* also comments on what sort of evidence is sufficient for a plaintiff to prove a wage-and-hour claim.  To the extent evidence would not support a just and reasonable inference under *Mt. Clemens*, it would not be sufficient to support a jury verdict.  As such, Helion can rely on *Mt. Clemens* to argue that there was insufficient evidence to support the jury verdicts, but not to suggest that the Field Technician Plaintiffs were barred from relying on less precise evidence, here their own testimony, to support their claims.

In any case, to the extent Helion argues that its GPS records satisfy its burden to maintain accurate time records, it is mistaken.  This is a case about allegedly misclassified workers. Until May 2018, Helion classified Field Technicians as exempt from the FLSA's overtime requirements and did not employ a system to record their time.  As a result, Helion does not have, nor did it ever maintain, records of the hours that the Field Technicians worked prior to May 2018.  Its analysis of GPS data from the Field

17

Technician Plaintiffs' company vehicles was prepared for this litigation and cannot satisfy Helion's duty to maintain time records.  In addition, as discussed below, a jury could reasonably find that the analysis of the GPS data does not accurately reflect the Field Technician Plaintffs' hours worked.

### 2.   Sufficiency of the Field Technician Plaintiffs' Evidence

The Field Technician Plaintiffs' testimony was sufficient to support the jury verdicts.  Their testimony was precise enough to prove their overtime hours worked by a preponderance of the evidence.  In addition, Helion's contention that the GPS data, or the Field Technician Plaintiffs' disregard of it, undermined their testimony improperly invites the court to intrude on the jury's responsibility to find facts.  The jury could reasonably have concluded that Helion's analysis was inaccurate and credited the Field Technician Plaintiffs' testimony.  The GPS data and analysis therefore cannot negate the weight or reasonableness of the Field Technician Plaintiffs' estimates as a matter of law.

To prevail at trial, FLSA plaintiffs must "prove by a preponderance of the evidence that they worked overtime hours without compensation and that [their employer] knew of such work." *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 987 (4th Cir. 1992).  As noted above, *Mt. Clemens* clarifies what is required to prove that an employee worked overtime without compensation where the

employer violates its duty to maintain accurate time records.  In such cases, the employee must introduce evidence to show "the 'amount and extent' of the work 'as a matter of just and reasonable inference[.]'"  *Talton v. I.H. Caffey Distributing Co., Inc.*, 124 F.App'x 760, 763 (4th Cir. 2005) (quoting *Mt. Clemens*, 328 U.S. at 687) (resolving appeal from summary judgment).  Courts differ on what is precisely required to meet this burden.  *See Alston v. DIRECTV, Inc.*, 254 F.Supp.3d 765, 789 n.12 (D.S.C. 2017) (Childs, J.) (citing, among other cases, *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014), and rejecting the view that a plaintiff's testimony "(a) must be so specific as to rise above the level needed for reasonable estimation or (b) must be accompanied by other substantiating evidence").

Whatever the precise requirements, the jury's verdict demonstrates that the Field Technician Plaintiffs satisfied them at trial.  Mr. McCloud testified that his regular work hours were from 8:00 a.m. to 5:00 p.m. (with an hour for lunch) but that he "always had to be on-call," that he sometimes did not finish by 5:00, and that approximately once a month he had to do onboarding project work that might require 7-8 hours of "after hours" work. (ECF No. 167, at 14:2-3, 18:12-19:18, 29:18-24, 32:9-14, 53:1-13). He indicated he worked late at least a couple times a week and also received on-call requests a couple times a week.  (*Id.*, at 52:1-5, 58:4-9).  Although not crystal clear, he suggested that

19

staying late or responding to on-call requests could often take two hours. (*See id.*, 53:18-21). He also testified that he typically worked for 30 minutes before leaving home for the day. (*Id.*, at 13, 22, 51). Taken together, he estimated that he worked ten hours of overtime each week, on average. (*Id.*, at 30:5-10, 59:13-24).

Mr. Toomey testified that his regular work hours were from 8:00 a.m. to 5:00 p.m. with an hour for lunch. (ECF No. 169, at 18:24-19:2). He worked on special projects every week-and-a-half or two weeks for which he had to work late into the night. (*Id.*, at 26:1-18). He traveled to at least seven client sites outside his geographic region for onboarding and remodel projects that often required overnight work. (*Id.*, at 67:12-74:15). He was on-call every other week for part of his employment and on-call once every three weeks for another part. (*Id.*, at 43:21-44:4). Sometimes the on-call requests would be resolved in less than an hour. (*Id.*, at 46:17-47:2). In at least one instance a request required an entire weekend of work. (*Id.*). He estimated that on average he worked fifteen-to-twenty-five hours of overtime per week and asserted that he worked at least some overtime every week. (*Id.*, at 48:14-49:3).

Mr. Turnerhill testified that he was expected to work eight hours a day, although he had some flexibility on when he started and ended. (ECF No. 166, at 28:11-25). The rule of thumb was

8:00 a.m. to 5:00 p.m. or 9:00 a.m. to 6:00 p.m., with an hour for lunch.  (*Id.*).  He typically worked 9:00 to 6:00 but typically started his day by 8:00 a.m.  (*See id.*, 29:13-15).  He worked 30 minutes to an hour before his official workday began in the morning.  (*Id.*, at 31:25-32:14).  Although his workload was highly variable, he would sometimes still be working at a client site at midnight or work through the night.  (*Id.*, at 37:1-3).  He was sent to San Antonio for multi-day onboarding projects that required after hours work.  (*Id.*, at 40: 9-19).  He was also on-call every day.  (*Id.*, at 42:3-13).  He could "easily pull a ten-hour day[.]" (*Id.*, at 48:23-24).  He estimated that he worked ten-to-fifteen hours a week in overtime on average.  (*Id.*, at 47:6-14).

Neither the GPS data nor Helion's analysis of it could undermine the Field Technician Plaintiffs' testimony as a matter of law.  Nothing about the data required the Field Technician Plaintiffs to incorporate it into their own estimates of hours worked.  Helion points to a District of New Jersey case, *Adami v. Cardo Windows, Inc.*, for the proposition that where a defendant introduces records of work performed (but not hours worked), plaintiffs must incorporate the facts reflected in those records into their time estimates and cannot disregard them.  *See* No. 12-cv-2804, 2015 WL 1471844, at *9 (D.N.J. Mar. 31, 2015).

That case, which is not binding on this court, is distinguishable.  The plaintiffs in *Adami* conceded that the

employer's records of work performed were accurate and could be used to "reconstruct each day" worked.   Neither are true here. The FLSA does not impose a burden on the Field Technician Plaintiffs to analyze the raw GPS data.   Neither that data nor Helion's analysis of it necessarily captured all the work they performed or all their compensable time.   Accordingly, the ability of both to reflect accurately the hours worked by the Field Technician Plaintiffs is hotly contested, as discussed below.   To the extent that *Adami*'s holding extends to records whose completeness and accuracy is disputed, it is unpersuasive.   To conclude that a plaintiff's testimony should not go to the jury because it was not informed by records which may be inaccurate is to make credibility and reliability determinations for the jury.[5]

The substantial conflict between the parties about the ability of the GPS data and Helion's analysis of it to reflect accurately the Field Technician Plaintiffs' hours worked also means that they could not somehow independently negate the reasonableness of the Field Technician Plaintiffs' testimony.   At the end of the day, this argument also seeks to have the court stand in the jury's shoes.   Before elaborating on why, a brief

---

[5] Helion also argues that the Field Technician Plaintiffs should have incorporated its Autotask records into their estimates of time worked.   That argument is doomed by Helion's own admission that the Autotask records do not accurately reflect time worked. (ECF No. 165, at 8).

description of why the jury might reasonably have found the records and analysis inaccurate is helpful.  First, the analysis was prepared by Helion's Vice President of Human Resources, Lucas Johnson, for this litigation.  Not only could the jury have concluded that he was not an impartial investigator of the GPS data, but it may also have concluded that he lacked the technical skills to analyze the data accurately.  Indeed, at least one error was identified during Mr. Johnson's testimony.

Second, the underlying GPS data concededly did not capture every day that the Field Technician Plaintiffs worked.  At least for Mr. McCloud, the GPS records were incomplete.  Months of data were missing.  (ECF No. 170, at 32:9-10).  The data also captures only information about the Field Technician Plaintiffs' travels when in their assigned territories.  It says nothing about movements when they traveled by means other than their company cars to different territories, as at least Mr. Toomey did.  Helion attempts to address these gaps by pointing to the fact that, in its analysis, the Field Technician Plaintiffs' average hours worked per week was less than forty.  It argues that the difference between the average it calculated and the average estimated by the Field Technician Plaintiffs was so great that it undermined their estimates.  Of course, that is a quintessential credibility determination that this court cannot make.  In addition, the FLSA operates week-by-week.  If Helion failed to pay its employees

overtime wages in any given week, it is liable for those unpaid wages.  The jury awarded the Field Technician Plaintiffs fewer damages than requested.  It could reasonably have concluded that the Field Technician Plaintiffs' estimates were high but that they worked overtime for which they were unpaid.[6]

Third, the analysis in Helion's summary GPS exhibits assumed that the Field Technician Plaintiffs' workdays always began when they arrived at the first worksite or Helion facility of the day and ended when they departed the last worksite or Helion facility of the day.  This assumption relies on a legal conclusion – that the Field Technician Plaintiffs never had compensable work time outside that window each day.  But disputes of fact must be resolved to make that legal conclusion.  As discussed below, the jury could reasonably have concluded that the Field Technician Plaintiffs' workdays sometimes started earlier and ended later than asserted by Helion, even though normal commute time is not compensable.

Under the FLSA, employers need not pay their employees for:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities,

---

[6] Ironically, Helion's own summary GPS exhibits included weeks with more than forty hours of work, essentially conceding unpaid overtime wages were due in those weeks.

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities. [This extends to] use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting . . . if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

29 U.S.C. § 254(a).

This means that, "[n]ormally, travel from home to work is not compensable regardless of whether the employee works at a fixed location or at different job sites." *Butler v. DirectSAT USA, LLC*, 55 F.Supp.3d 793, 814 (D.Md. 2014) (Chasanow, J.) (citing 29 U.S.C. § 254(a); 29 C.F.R. § 785.35). But a plaintiff may obtain compensation for his commute "under the continuous workday doctrine, where the compensable workday begins with the first principal activity of a job and ends with the employee's last principal activity." *Id.* (internal quotations omitted) (quoting *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 363 (4th Cir. 2011)) (citing 29 C.F.R. § 790.6(a)).

Whether an activity is principal "is a mixed question or law and fact[.]" *Jones v. Hoffberger Moving Servs.*, 92 F.Supp.3d 405, 411 (D.Md. 2015) (Bredar, J.). Even activities seemingly outside

25

the workday "are compensable [] if they are an 'integral and indispensable part of the [employee's] principal activities,'" because "integral and indispensable" activities are themselves principal activities. *Perez*, 650 F.3d at 363 (quoting *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)) (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37, (2005)). "[T]he test for whether an activity is 'integral and indispensable' is 'tied to the productive work that the employee is employed to perform.'" *Aviles-Cervantes v. Outside Unlimited, Inc.*, 276 F.Supp.3d 480, 492 (D.Md. 2017) (Bennett, J.) (quoting *Depew v. Mobile Dredging & Pumping Co.*, No. 15-cv-3080-JMC, 2017 WL 1382307, at *6 (D.Md. Apr. 18, 2017) (quoting *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33, 36 (2014))). "That is, '[a]n activity is only 'integral and indispensable' to the performance of an employee's principal activities if 'it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities.'" *Id.*

The Field Technician Plaintiffs introduced sufficient evidence through their own testimonies for the jury to conclude that their compensable workdays began before or during their commute to their first job site and ended after their departure from their last job site. The Field Technician Plaintiffs testified that they fielded substantive emails and calls about their work with Helion, including about problems at client sites,

before they left home in the morning, during their commutes in the morning, and after they arrived home at the end of the day.  The jury could have concluded that this work was integral and indispensable to their principal job duties and therefore extended the start and end of their continuous workday.

Mr. McCloud testified that "[s]ometimes [he] had meetings with the client before [he] would actually get to the site" in which he would "try to troubleshoot" with the client over the phone.  (ECF No. 167, at 13:23-24, 22:16-19).  He also testified that he would "[c]heck[] emails" in the morning and that the Field Technicians "[a]lways had our phones on us so, you know, we're getting calls from clients throughout the day[.]"  (*Id.*, at 22:21-24).  This work usually started by 8 a.m., before he left for his first site visit and, all told, such tasks would usually take 30 minutes.  (*Id.*, at 51:8-20).

Mr. Toomey testified that he would respond to emails at the end of the day, sometimes until 10:00 or 11:00 p.m.  (ECF No. 169, at 34:17-18, 36:15-23).  He would also start work an hour and a half or an hour before his official start time.  (*Id.*, at 35:18-20).  During that time, he would send emails and contact clients. (*Id.*, at 35:23-25).  Sometimes he would have to pull over on his way to the first job of the day to take calls from the desktop department or a client to troubleshoot problems.  (*Id.*, at 37:18).

He estimated that his morning tasks took him an hour or an hour and a half, on average.  (*Id.*, at 38:3-6).

Mr. Turnerhill testified he would have phone calls with clients before he left in the morning.  (ECF No. 166, at 29:5-18).  Sometimes he was just calling to schedule a time for arrival, but other times he was calling management or other technicians for direction because his assignment was unclear or it dealt with an issue with which he was unfamiliar.  (*Id.*, at 29:19-30:4).  Sometimes he would also be following-up on issues from prior days' work.  (*Id.*, at 30:19-31:3).  He would also check emails in the morning, and they sometimes covered work-related matters distinct from his daily assignments.  (*Id.*, at 31:15-24).  He estimated that he spent 30 minutes to an hour on such tasks before he left home each morning.  (*Id.*, at 31:25-32:14).

At bottom, the jury was instructed appropriately following the close of all evidence on the applicable legal principles at issue in the case, how to evaluate the evidence presented by the parties, and the method for calculating damages.  The jury was instructed on the factors to consider when evaluating the credibility of a witness.  In addition, the jury was instructed on the applicable law and the background of the case, including that the Field Technician Plaintiffs were employees of Helion who were entitled to overtime pay if they were not exempt.  The jury was informed that Helion conceded that they did not pay the Field

Technician Plaintiffs overtime wages during the relevant time period. The jury was also instructed that each Field Technician Plaintiff was required to prove by a preponderance of the evidence that he worked hours for which he was not paid overtime. Finally, the jury was given the formula for computing the wages owed to each Field Technician Plaintiff.

Based on the testimony adduced at trial and in accordance with instructions provided by the court, the jury determined that the Field Technician Plaintiffs each established by a preponderance of the evidence that he performed work for which he was owed compensation by Helion. Helion's motion for JNOV will be denied. It asks the court to weigh the credibility of the Field Technician Plaintiffs against the credibility and accuracy of Helion's GPS analysis and its supporting testimony. That determination is within the jury's purview, not the court's. Based on the damages amounts awarded by the jury, all of which were lower than the amount requested by the Field Technician Plaintiffs, it is clear that the jury weighed all of the testimony presented by the parties to arrive at its verdict. Moreover, viewing the testimony from trial in the light most favorable to the Field Technician Plaintiffs, a reasonable jury could find that they were entitled to their respective damages amounts.

**IV.   Conclusion**

For the foregoing reasons, Helion's motion to alter or amend the judgment and for judgment as a matter of law will be denied. A separate order will follow.

                                    _____/s/_____
                                    DEBORAH K. CHASANOW
                                    United States District Judge